SHAWMUT BANK CONNECTICUT, N.A. *v.* CONNECTICUT
LIMOUSINE SERVICE, INC.
(13812)

Lavery, Spear and Hennessy, Js.

Argued October 23, 1995—decision released February 6, 1996

*Rodger C. Boe*, with whom, on the brief, was *Donald D. Philips*, for the appellant (defendant).

*Howard L. Siegel*, with whom was *Margaret M. Pinkham*, for the appellee (plaintiff).

LAVERY, J. The defendant, Connecticut Limousine Service, Inc., appeals from the judgment of the trial court ordering it to wind up its business and affairs pursuant to General Statutes § 33-382 (a).[1] The defendant claims that the trial court improperly (1) interpreted a pledge agreement between the parties to entitle the plaintiff, Shawmut Bank Connecticut, N.A.,[2] to the voting power of pledged shares of stock, (2) corrected a scrivener's error when no claim for reformation was brought, (3) allowed parol evidence pertaining to the preparation of the pledge agreement, (4) admitted exhibits over the defendant's objection, and (5) found

---

[1] General Statutes § 33-382 (a) provides in pertinent part: "The superior court for the judicial district where the principal office of a corporation is located, or any judge thereof, shall wind up the business and affairs of such corporation on petition of the following persons in the following cases: (1) In a proceeding by a holder or holders of shares having voting power sufficient under the circumstances to dissolve the corporation pursuant to the certificate of incorporation . . . ."

[2] Shawmut Bank Connecticut, N.A., was formerly known as Connecticut National Bank. Connecticut National Bank originally entered into the pledge agreement with Connecticut Limousine Group, Inc., and Connecticut Limousine Service, Inc.

that the plaintiff was not limited to the remedies expressly provided in the pledge agreement. We affirm the judgment of the trial court.

The trial court found the following facts. On September, 19, 1986, the parties executed a pledge agreement under which the defendant pledged 1000 shares of its stock to the plaintiff as collateral security for certain loan obligations. On August 28, 1992, the parties amended the pledge agreement as part of a comprehensive loan restructuring agreement involving an aggregate indebtedness in excess of $8 million. The pledge agreement, as amended, provides that the defendant pledge the 1000 shares of its stock as security for the August 28, 1992 loan obligations.

Pursuant to the August 28, 1992 loan agreement, the defendant was required to make monthly payments of $105,150 to the plaintiff. The defendant has not made these monthly payments since September, 1993. In November, 1993, the plaintiff declared the loans to be in default and, thereafter, sought to enforce its rights under the pledge agreement to exercise all voting rights of the pledged stock. In December, 1993, the plaintiff filed this action to wind up the business and affairs of the defendant pursuant to § 33-382 (a).

The pledge agreement contains the following provisions relating to the voting power of the pledged stock. Section 1 (B) of the pledge agreement states that the defendant retains all voting powers pertaining to the pledged stock "[u]nless and until an event of default specified in section 4 . . . shall occur."[3] Pursuant to § 1 (C) of the pledge agreement, the plaintiff shall have

---

[3] Section 1 (B) of the pledge agreement provides in pertinent part: "Unless and until an event of default specified in section 4 hereof (any event so continuing being hereinafter called a 'default') shall occur: (1) pledgor shall be entitled to exercise all voting and/or consensual powers pertaining to the pledged stock or any part thereof . . . ."

the sole and exclusive right to exercise all voting privileges in the event of any default.[4] Section 4 of the pledge agreement provides that the defendant will not "issue shares or classes of its stock . . . or redeem any shares of its stock." Section 5 of the pledge agreement, entitled "Defaults," provides a list of actions constituting an "event of default," including a default on payment obligations under the August 28, 1992 loan agreement.[5]

The trial court held that the reference in § 1 (B) of the pledge agreement to "an event of default in section 4" was a clerical or typographical error, and that § 5, rather than § 4, of the pledge agreement identifies events of default. Applying that construction to the pledge agreement, the trial court found that when the defendant defaulted on its payment obligations under the loan agreement, the plaintiff was entitled to exercise all voting privileges pertaining to the pledged stock. The trial court concluded that the plaintiff was entitled to the relief sought under § 33-382 (a) because it held the right to vote all of the authorized, issued and outstanding shares of the defendant's stock.

I

The defendant claims that the trial court improperly concluded that a payment default entitled the plaintiff to the exclusive voting power of the pledged shares. The defendant relies on § 1 (B) of the pledge agreement, which states that the defendant is entitled to the voting powers pertaining to the pledged stock until a default

---

[4] Section 1 (C) of the pledge agreement provides in pertinent part: "If any default shall have occurred and while the same is continuing: (1) the bank or its nominee or nominees shall have the sole and exclusive right to exercise all voting and consensual powers pertaining to the pledged stock or any part thereof . . . ."

[5] Section 5 of the pledge agreement provides in pertinent part: "The following will constitute 'events of default' hereunder, namely . . . (C) default by pledgor for five days in the payment of any amount owing under the agreement or the loan when due."

specified in § 4 of the pledge agreement. We find that the trial court properly concluded that the reference to § 4 in § 1 (B) of the pledge agreement was a scrivener's error.

The general rules of contract construction apply when construing a pledge agreement. When interpreting a contract, we construe the contract as a whole and all relevant provisions are considered when determining the intent of the parties. *White* v. *Kampner*, 229 Conn. 465, 473, 641 A.2d 1381 (1994). "The rules of construction 'dictate giving effect to all the provisions of a contract, construing it as a whole and reconciling its clauses. . . . Where two clauses which are apparently inconsistent may be reconciled by a reasonable construction, that construction must be given, because it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions.' " *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.*, 32 Conn. App. 530, 534, 630 A.2d 115 (1993), quoting *Dugan* v. *Grzybowski*, 165 Conn. 173, 179, 332 A.2d 97 (1973).

In this case, the written pledge agreement contains inconsistent clauses relating to the voting power of the pledged stock. As written, § 1 (B) of the pledge agreement allows the defendant to exercise voting rights until it either issues further shares of its outstanding stock or redeems any shares of stock. Section 1 (C) provides, however, that the plaintiff is entitled to exercise voting rights if the defendant, inter alia, defaults on its payment obligations under the loan agreement. We find that these clauses are inconsistent and can be reconciled only by construing the pledge agreement to mean that a transfer of voting power takes place only upon an "event of default" listed in § 5.

The defendant's construction of the pledge agreement would make § 5 of the pledge agreement meaningless by transferring voting power only if the

defendant issued further shares of stock or redeemed shares. "Parties do not ordinarily insert meaningless provisions in their agreements and, therefore, if it is reasonably possible to do so, every provision must be given effect." *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.*, supra, 32 Conn. App. 534. We agree with the trial court that the pledge agreement must be construed to mean that voting power is transferred upon an event of default listed in § 5.

## II

The defendant claims that the trial court's construction of the pledge agreement constitutes a reformation of the contract when such relief was not requested by the plaintiff. We recognize that before reformation can be granted by the court, equitable relief must specifically be requested by the plaintiff. Practice Book § 139;[6] *Prudent Projects* v. *Travelers Ins. Co.*, 3 Conn. App. 429, 431, 489 A.2d 396 (1985); 1 Restatement (Second), Contracts § 155 (1981). We conclude, however, that the trial court's construction of the pledge agreement was not a reformation.

An action for reformation rests on the equitable theory that the instrument sought to be reformed does not express the intention of the parties because it was executed as the result of mutual mistake or unilateral mistake coupled with fraud or inequitable conduct on the part of the other party. *Greenwich Contracting Co.* v. *Bonwit Construction Co.*, 156 Conn. 123, 126, 239 A.2d 519 (1968). "In many instances, words used by the parties in their writing are not particularly suitable to express their meaning, but they are nevertheless capable of being interpreted, even without an actual physical reformation of the contract. . . . In such a case no

---

[6] Practice Book § 139 provides: "A party seeking equitable relief shall specifically demand it as such, unless the nature of the demand itself indicates that the relief sought is equitable relief."

equity power is required." D. Dobbs, Law of Remedies (2d Ed. 1993) § 11.6 (3). If the word in question appears to be an error, the trial court may, by looking at the contract as a whole, interpret the word so it is more logically suited to the agreement. See *Roth* v. *Phillips Petroleum Co.*, 739 S.W.2d 598, 600 (Mo. App. 1987).

We agree with the trial court that the pledge agreement is capable of being interpreted by looking at the writing as a whole and reconciling inconsistent provisions. The trial court found that the pledge agreement contained inconsistent language and interpreted the agreement accordingly. The trial court did not reform the agreement by use of equitable powers. We conclude that the plaintiff was not required to request equitable relief and that the trial court properly construed the pledge agreement.

## III

The defendant also claims that the trial court improperly allowed parol evidence concerning the drafting of the pledge agreement. Specifically, the defendant claims that the trial court improperly allowed into evidence the testimony of Melvin Ditman, an attorney who prepared the pledge agreement. Ditman testified that the reference in § 1 (B) of the pledge agreement to § 4 was incorrect, and that the reference should have been to § 5. We agree with the trial court's decision that Ditman's testimony did not violate the parol evidence rule.

The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Giorgio* v. *Nukem, Inc.*, 31 Conn. App. 169, 173–74, 624 A.2d 896 (1993); see also 2 Restatement (Second), Contracts § 213 (1981). The rule does not forbid the presentation of parol evidence, but prohibits the use of such evidence to vary or contradict the terms of the contract. *TIE Communications, Inc.* v. *Kopp*,

218 Conn. 281, 288, 589 A.2d 329 (1991). When a court is faced with an issue of the construction of a contract containing inconsistent clauses, the parol evidence rule does not apply. All relevant evidence is admissible on the issue of contract interpretation, and "[a]ny determination of the meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, *preliminary negotiations and statements made therein*, usages of trade, and the course of dealing between the parties." (Emphasis added.) 2 Restatement (Second), supra, § 212, comment (b). "The only limitation is that 'the asserted meaning must be one to which the language of the writing read in context, is reasonably susceptible in the light of all of the evidence introduced.' " J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 3-15, quoting 2 Restatement (Second), supra, § 215, comment (b). The operative question becomes whether parol evidence is offered to contradict the writing or to aid in its interpretation. *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 273, 439 A.2d 314 (1981).

In this case, the trial court was faced with an issue of contract interpretation. Ditman's testimony was probative on the proper construction of two inconsistent clauses in the pledge agreement. We find that the testimony was not offered to contradict the writing, but to determine which of the references to events of default found in the two transfer of voting power provisions should be given effect. We conclude that the trial court properly allowed Ditman's testimony into evidence to aid in the court's construction of the pledge agreement.

## IV

The defendant's next claim is that the trial court improperly admitted several trial exhibits into evidence without a proper foundation for their admission as busi-

ness records pursuant to General Statutes § 52-180.[7] At trial, the plaintiff offered computer printouts relating to the amounts due and owing on the various loans secured by the pledge agreement under the business records exception to the hearsay rule. Paul Balboni, a loan officer with the plaintiff, testified that he was personally familiar with the plaintiff's loan relationship with the defendant and that the bank maintained computer records with regard to these loans. The defendant objected on the ground that the plaintiff failed to authenticate the records with testimony by a witness with working acquaintance with the methods by which such records are made.

"Section 52-180 should be liberally construed, and review is limited to determining whether the trial court abused its discretion in admitting a document under that section." *State* v. *Lawler*, 30 Conn. App. 827, 832, 622 A.2d 1040 (1993). In *American Oil Co.* v. *Valenti*, 179 Conn. 349, 360–61, 426 A.2d 305 (1979), our Supreme Court found that a witness must have personal experience with record keeping procedures in order to be competent to testify that computer generated records were made in the ordinary course of business. "What is crucial is not the witness' job description but rather his knowledgeability about the basic elements that afford reliability to computer printouts. . . . The witness must be a person who is familiar with computerized records not only as a user but also as someone with some working acquaintance with the methods by which such records are made." (Citation omitted.) Id.

In this case, Balboni testified that he was familiar with the procedures by which the bank enters data into

---

[7] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the

the computer system, outlined those procedures and stated that he and other bank officers found the procedures reliable. We conclude that the trial court did not abuse its discretion by admitting the computer generated records based on Balboni's testimony.

## V

The defendant's final claim is that the trial court improperly concluded that the plaintiff was not limited to the remedies provided in the pledge agreement. The defendant refers to § 2 of the pledge agreement, which sets forth three remedies available to the plaintiff in the event of a default.[8] The defendant claims that the plaintiff is not entitled to maintain an action under § 33-382 (a), but is limited to (1) the rights available under the Uniform Commercial Code, (2) the right to apply cash held as collateral toward payment of the loan, or (3) the right to sell the pledged stock. The trial court found that the remedies set forth in § 2 were not intended to exclude all other remedies. We agree.

Parties to a contract may agree on the remedies available in the event of a breach of contract. If the language of the agreement discloses that the parties intended to limit the remedies to those stated, the agreement will be enforced and the party will be limited to the exclusive remedies outlined in the agreement. See *Coastal Computer Corp.* v. *Team Management Systems, Inc.*, 624 So. 2d 352, 353 (Fla. App. 1993); *Middleton* v. *Klingler*,

---

regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

[8] Section 2 of the pledge agreement, entitled "Remedies," provides in pertinent part: "If any default shall have occurred and be continuing, in addition to any rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in Connecticut, the bank may, without being required to give any notice except as hereinafter provided (i) apply the cash, if any, then held by it as collateral hereunder to the payment of the note . . . and (ii) if there shall be no such cash or the cash so applied shall be insufficient to pay in full all such obligations, sell the pledged stock . . . ."

410 N.W.2d 184, 186 (S.D. 1987). A contract will not be construed to limit remedial rights unless there is a clear intention that the enumerated remedies are exclusive. See *In re Hale Desk Co.*, 97 F.2d 372, 373–74 (2d Cir. 1938); 17A Am. Jur. 2d 762–63, Contracts § 748 (1991); see also *Gaynor Electric Co.* v. *Hollander*, 29 Conn. App. 865, 871–72, 618 A.2d 532 (1993) (holding that under General Statutes § 42a-2-719 parties may limit remedy for breach if limitation clearly expressed).

In this case, the pledge agreement contains no language indicating that the parties intended the remedies contained in § 2 to be the exclusive remedies available to the plaintiff in the event of a default. We agree with the trial court that the remedies in the pledge agreement are not exclusive and that the plaintiff was entitled to maintain an action under General Statutes § 33-382 (a).

The judgment is affirmed.

In this opinion the other judges concurred.