**MS. LIBERTY INC., Plaintiff,**

v.

**EYELEMATIC MANUFACTURING COMPANY, INC., Defendant.**

**No. 95 CV 10950.**

United States District Court,
S.D. New York.

July 10, 1996.

Mark Rosen, Greenberg Trager Toplitz & Herbst, New York City, for Plaintiff.

Thomas J. Samsone, Carmody & Torrance, New Haven, CT, for Defendant.

## MEMORANDUM DECISION & ORDER

PARKER, District Judge.

This case presents for decision the interpretation of the termination provision of a sales representative contract between the plaintiff Ms. Liberty Inc. ("Ms. Liberty") and the defendant Eyelematic Manufacturing Company, Inc. ("Eyelematic"). Since the resolution of this case is driven primarily by this discreet question, the Court, pursuant to Fed.R.Civ.P. 42(b) held a trial limited to contract interpretation. Findings of Fact and Conclusions of Law follow. *See* Fed. R.Civ.P. 52(a).

Eyelematic is a Connecticut corporation having its principal place of business in Watertown, Connecticut. It is in the business of manufacturing packaging and component parts for the cosmetics industry. Henry Seeback is Eyelematic's President and Chief

Executive Officer and Al Velicka is its Vice–President of sales and marketing.

Ms. Liberty is a New York corporation. Its sole shareholder, director and officer is Diane Elliot, who operates the corporation from her residence in Bedford, New York. The business of Ms. Liberty is to hire out Elliot as an independent sales representative to solicit and cultivate customers for clients such as Eyelematic.

Velicka had known and worked with Elliot prior to his joining Eyelematic in May 1988. Shortly after joining Eyelematic, Elliot and Velicka had discussions in the fall of 1988 contemplating a possible business arrangement between her and Eyelematic since it was looking to hire independent sales representatives to expand its cosmetics part business. The discussions ranged across a variety of topics including Elliot's commission rate, her ability to work for others, as well as the circumstances under which the relationship, if consummated, could at some future time be terminated.

Eyelematic had used independent contractors in the past and its historical practice had been to provide that contracts could be terminated by either party after one year. Elliot, for her part, was concerned during negotiations that commissions payable after termination for pre-termination work be protected. The 1988 negotiations centered around a number of topics, but this one was prominent.

Prior to October 1, 1988, Velicka sent to Elliot a draft agreement that he had prepared on his word processor. The agreement contained the following provisions:

7. This Agreement shall be effective for one year from this date, and shall continue thereafter for an indefinite period of time unless terminated by either party at the original date upon 30 days written notice to the other party....

8. Commissions will be paid on all residual business developed by Ms. Liberty Inc. for six months after termination.

Elliot testified that termination protection was important to her. She believed she required protection in the event she devoted considerable time to cultivating a relationship that would prove beneficial to Eyelematic but was terminated before any commissions were payable. She testified she understood these clauses permitted her to be terminated only during an annual window period commencing 30 days prior to the anniversary of the execution of the contract. She testified that the purpose of paragraph 8 was to provide that she would be paid commissions on residual business for a period of six months after termination. Thus, according to her understanding of the agreement, in the event of termination occurring at any time other than the anniversary date, she would be entitled to continue to receive commissions both until the anniversary date and for a period of six months thereafter.

Velicka's understanding of what transpired, and what was ultimately agreed upon, differed from Elliot's. He testified that the clause in question—paragraph 7—inadvertently omitted a line and should have read as follows:

"This Agreement shall be effective for a one year period from this date, and shall continue thereafter for an indefinite period of time unless terminated by either party at the original *expiration date or at a date subsequent to the expiration* date upon 30 days written notice to the other party."

His recollection was that he had intended to lift this language from a prior form of contract Eyelematic had used with other sales representatives. He testified that he sent to Elliot, prior to the execution of the October 1, 1988 agreement, a form agreement, with identifying references deleted, which contained this language. Elliot, on the other hand, testified that she had no recollection of receiving such a draft agreement. In any event, Velicka proceeded to draft a final version of the contract on his home word processor. He testified he lifted the language from one of the prior sales representative's contract and incorporated it into his draft agreement with Elliot. In the process of this drafting the underscored line was inadvertently omitted. He also testified that he later used the contract he had drafted for the plaintiff for subsequent sales representative contracts and continued to insert and use the

paragraph with the inadvertently omitted line.

Following the execution of the October 1, 1988 contract, the relationship went forward and apparently, for a time, was considerably profitable to both parties. By 1992, however, Eyelematic began to have concerns about the amount of commissions required to be paid to Elliot since they had increased substantially because of her success and also because Eyelematic was experiencing economic pressures from increases in the price of aluminum, a critical raw material.

Thus, in the fall of 1992, Eyelematic considered terminating the contract, and Seeback instructed Velicka to take steps to do so. In October 5, 1992, Velicka notified Elliot that the contract was terminated effective October 5, 1992. After being notified of the termination, Seeback and Elliot met to discuss the matter. After those discussions, the termination was rescinded when Elliot agreed to reduce her commission rate. Apparently Elliot did not raise at that time her claim that the termination had been attempted on a date which was not proper under her understanding of the agreement.

Later in November, 1994, Eyelematic apparently made a decision to cease, or at least reduce, its reliance on outside sales representatives and to move the work in-house. At that time, Velicka notified Elliot that her contract would be terminated and offered her a full-time sales position at an annual fixed salary plus expenses and various fringe benefits. From this time in November through mid-December 1994, Elliot, Seeback and Velicka had various discussions concerning the termination. Basically, Elliot was resistant to the notion of accepting a fixed salary in lieu of her lucrative commission arrangement. By letter dated December 19, 1994, Velicka confirmed that the arrangement between the parties would be terminated.

On December 20, 1994, Elliot responded to the termination letter claiming that it did not comply with the October 1988 contract. Elliot argued that the contract could only be terminated as of October 1 on 30 days written notice. She contends, therefore, that under paragraph 7 the contract could only be—and thus was—terminated as of October 1, 1995, and not as of December 19, 1994. Eyelematic contends that this claim surfaced for the first time in late December and had not been raised during any prior contract discussions.

### DISCUSSION

█ A threshold issue is the governing law. The agreement was negotiated, drafted and executed in Connecticut. Eyelematic is a Connecticut corporation and manufactures its products in Connecticut. Although the contract was performable by Elliot at various locations, the commissions were payable from Connecticut. Most of the dealings between Elliot, Velicka and Seeback occurred in Connecticut. Thus, the Court concludes that Connecticut has the greater nexus of contacts and Connecticut law applies.[1] *See Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131, 137 (2d Cir.1991) ("the law of the jurisdiction having the greatest interest controls") (internal quotation and citation omitted).

█ Paragraph 7 is ambiguous. The ambiguity is whether the contract can be terminated only at the "original date" upon 30 days written notice or whether the contract can be terminated at some date subsequent to the original date upon 30 days notice. Under Connecticut law, where there is an ambiguity in a contract, parole evidence may be considered. *See Shawmut Bank Connecticut N.A. v. Connecticut Limousine Service Inc.,* 40 Conn.App. 268, 275, 670 A.2d 880 (1996). The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of a written, integrated contract, but does not bar extrinsic evidence to facilitate the understanding of uncertain contract language. As the Court noted in *Schwab v. Schwab,* 1996 WL 97398 *2 (Conn.Super.1996) it is "fundamental that when words used in contracts are uncertain or ambiguous, parole evidence of conversation between the parties or other circumstances antedating the contract may be used as an aid in determining the intent of the parties which was expressed by the written

1. The parties concede that the result would be the same under New York law.

word." Equally important, where two interpretations of a contractual provision are possible, the preferable interpretation is the more equitable and rational of the two. *See Schwab,* 1996 WL 97398 at *2; *Saturn Construction Co. v. State of Connecticut,* 1994 WL 590604 *6 (Conn.Super.1994).

The interpretation pressed by Elliot is that the contract was only subject to cancellation at "the original date upon 30 days written notice." The "original date" is not defined in the contract, but the contract was signed October 1, 1988. Assuming October 1, 1988 to be the "original date," Elliot's interpretation tying cancellation to this date would make paragraph 7 unintelligible. Both parties agree that it is clear that the contract could not be cancelled during its first year. But it is then equally clear that the contract could never be terminated on October 1, 1988—the "original date."

Plaintiff's variation of this argument is that the Court should construe the term "original date" to mean "anniversary date" and conclude that the contract can only be terminated after a year has passed, and in such event, only on October 1 of each succeeding year with 30 days notice. The contract as well as the parole evidence adduced at trial, however, do not support this interpretation. There is simply no credible evidence that when the contract was entered either party understood "original date" to mean "anniversary date."

 The interpretation supported by the evidence and adopted by the Court is that the parties intended that the contract be subject to cancellation on 30 days notice after the initial year had expired. *See Goodyear v. Orsatti,* 1990 WL 277470 *1 (Conn.Super.1990) ("A contract is construed according to what may be assumed to have been the understanding and intention of the parties.") (citations omitted). This is so for several reasons. First, both parties testified that Elliot was concerned with securing contractual protection for commissions payable post termination. This was not, however, what paragraph 7 was intended to accomplish. This contingency was treated elsewhere in the contract, namely, in paragraph 8 which permitted Elliot to collect commissions on all residual business for a period of six months

after termination. This interpretation accommodates both paragraphs 7 and 8 while plaintiff's interpretation would render paragraph 8 superfluous. Under Connecticut law, the "rules of construction dictate giving effect to all the provisions of a contract, construing it as a whole and reconciling its clauses.... Where two clauses which are apparently inconsistent may be reconciled by a reasonable construction, that construction must be given, because it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions." *Shawmut Bank,* 40 Conn.App. at 272, 670 A.2d 880 (internal quotation and citations omitted).

For the foregoing reasons, the Court concludes that the termination of Elliot on December 20, 1994, did not violate the termination provisions of the October contract between the parties.

SO ORDERED.