[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This decision concerns only Count 2 of the amended complaint dated October 7, 1993. Plaintiffs Greystone Partnerships Group, Inc. ("Greystone") and Dr. George Naskaris ("Naskaris") seek to recover a fee owed to them by defendant CKM Associates ("CKM"), a Connecticut general partnership, for arranging the sale of two healthcare facilities known as the D'Amore Resthaven and the Prospect Hill Rehabilitation Center (collectively, the "D'Amore facilities") to an affiliate of American Health Foundation, Inc. ("AHF"). The plaintiffs claim that they are entitled to this fee pursuant to an agreement which they entered into in June, 1990 with CKM and several other signatories. They also seek to hold CKM's general partners, defendants Kenneth J. Messier (Messier"), Howard Chamberlain ("Chamberlain"), and David Kazarian ("Kazarian"), individually liable for CKM's partnership debt.
The agreement under which the plaintiffs seek payment provides in pertinent part as follows:
AGREEMENT
THIS AGREEMENT made and entered into this ____ day of June, 1990 by and among Dr. George N. Naskaris, Care Facilities Sales Group, Inc., Greystone Partnerships Group, Inc. and any affiliate of any of the foregoing entities (all of whom are hereinafter collectively referred to as "Dr. Naskaris"); Kenneth J. Messier, Howard Chamberlain, David Kazarian, CKM Associates and any affiliate of any of these individuals and entity (all of whom are hereafter collectively referred to as the "Manager"); AHF/Home Office, Inc., and its to-be-formed affiliate, AHF Connecticut, Inc. and AHF/Massachusetts, Inc. (all of whom are not-for-profit corporations hereafter collectively referred to as "AHF"); and Health Care and Retirement Corporation of America, Waterbury Manor, Inc., and Meadows Mannor, Inc. and any affiliate of any of these entities (all of which are collectively hereafter referred to as "HCR").
RECITALS: CT Page 5204-N
WHEREAS, HCR is the owner of six (6) long-term care facilities located in Connecticut (the "Connecticut Facilities") and five (5) long-term care facilities located in Massachusetts (the "Massachusetts Facilities") and has entered into an agreement with AHF to sell the Connecticut Facilities to AHF, the closing of which is conditioned upon execution of a similar agreement to sell the Massachusetts Facilities to AHF; and
WHEREAS, HCR and AHF desire that the Manager manage the Connecticut Facilities pursuant to a written agreement with AHF following their sale to AHF, and HCR and AHF may also desire that the Manager manage one or more of the Massachusetts Facilities following the sale of those Facilities by HCR to AHF; and
WHEREAS, certain of the principals of Manager have requested AHF to purchase the D'Amore Rest Haven, Prospect Hill Rehabilitation Center and Bickford Convalescent Home (the "Additional Connecticut Facilities"); and
WHEREAS, Dr. Naskaris is entitled to fees or other forms of reimbursement in connection with the transactions described hereinabove and now desires to reach a final, binding agreement and settlement relating to such fees and reimbursement in order that such transactions can be consummated.
NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:
1. Payment to Dr. Naskaris . . .
(a) . . .
(b) . . .
(c) Payment by Manager With Respect to AdditionalConnecticut Facilities. At and contingent upon the closing of the sale of the Additional Connecticut Facilities by the present owners thereof to AHF, Manager shall pay Dr. Naskaris, and Dr. Naskaris shall accept, a fee equal to one and one-half percent (1.5%) of the purchase price paid by AHF for, or the total tax exempt bond proceeds received by AHF in connection with the financing of its purchase of, the Additional Connecticut Facilities, whichever is greater; such fee will be payable by CT Page 5204-O Manager in cash at such closing.
At issue is the interpretation of the provision of section 1.(c) set forth above. That paragraph provides that contingent upon the closing of the "Additional Connecticut Facilities", Manager shall pay Dr. Naskaris a fee. The "Additional Connecticut Facilities" include D'Amore Rest Haven, Prospect Hill Rehabilitation Center, and Bickford Convalescent Home.
It is undisputed that two of the "Additional Connecticut Facilities", namely D'Amore Rest Haven and Prospect Hill Rehabilitation Center (a/k/a The D'Amore Facilities) were sold, and that Bickford Convalescent Home has not been sold. Plaintiffs claim they are entitled to be paid the fee set forth in section 1(c) of the agreement for the two D'Amore facilities that were sold. Defendants maintain that they do not owe the plaintiffs any fee for the sale of the two D'Amore Facilities because the Bickford Convalescent Home ("Bickford") has not been sold.
After studying the contract as a whole and specifically section 1.(c), the court found the terms of the contract to be ambiguous. It is not clear by just looking at the contract, and knowing no more, whether the plaintiffs were to be paid upon the sale of each additional Connecticut facility, or only upon the sale of all three. Accordingly, the court heard parol evidence so that it could interpret the agreement. Shawmut Bank Connecticut,N.A. v. Connecticut Limousine Service, Inc., 40 Conn. App. 268,275. Hare v. McClellan, 234 Conn. 581, 597 (1995).
A hearing was held on February 1, 1996. The court finds that the evidence introduced weighs in favor of the plaintiffs' position. The pertinent facts found at the hearing indicate the following:
Naskaris is the president of Greystone and its only stockholder. He is in the business of purchasing and specializing in the health care industry and, specifically, nursing homes. In 1987 he learned that a company called Healthcare and Retirement Corporation of American ("HCR") had acquired a number of healthcare facilities which it might be willing to sell. Naskaris then engaged in negotiations with defendants Messier, Chamberlain and Kazarian, acting as CKM Associates, about forming a corporation to purchase the HCR facilities. In 1988 the parties entered into an agreement to form a corporation in order to purchase the HCR facilities. Naskaris would be a one-third owner CT Page 5204-P of the corporation and CKM would be a two-thirds owner. A corporation was not formed, however, because CKM was unable to obtain financing to purchase the HCR facilities.
Subsequently on June 10, 1989 an agreement between Greystone (then known as Care Facility Sales Group, Inc.) as finder, and CKM as Manager, was signed. (Exhibit 2). The agreement provided that in consideration of plaintiffs' expertise in the acquisition process and defendants' ability in management of health facilities, a corporation would be formed to manage HCR facilities which were expected to be acquired by a not-for-profit corporation. The agreement provided that Greystone would own one-third of the corporation and would also receive one-third of any management fees received by the corporation. CKM would own two-thirds of the corporation and would receive two-thirds of the management fees. It was contemplated that additional facilities might be managed by the corporation, and that if so, "Finder" (Greystone) and "Manager" (CKM) would share in the additional fees (after payment of expenses) at the rate of one-third to Finder and two-thirds to Manager. Nothing in that agreement defined or limited what was meant by "additional facilities."
After the execution of the June 10, 1989 agreement Naskaris informed CKM that he had located American health Foundation ("AHF") as a prospective buyer for the HCR facilities. He also informed CKM that he was working on a prospective purchase of the D'Amore facilities on behalf of AHF. He made numerous trips to the corporate offices of HCR and on at least one of those occasions he brought two of the three partners of CKM. He also had a number of meetings with Mr. and Mrs. D'Amore in an attempt to negotiate purchase of their two health care facilities as well.
In October of 1989 CKM requested that Naskaris give up certain rights that he had under the June 10, 1989 agreement. Subsequently over a period of months, the parties negotiated concerning modification of plaintiffs' rights under the June 10, 1989 agreement. In March of 1990 the negotiations changed and the parties started discussing the terms of another agreement whereby CKM would buy out the plaintiffs' interest in the to-be-formed corporation as set forth in the June 10, 1989 agreement. Under such new agreement the plaintiffs would no longer be a part of the corporation. Various proposals were discussed and presented back and forth concerning the buy-out of the plaintiffs' interest. At no time did the defendants discuss with Naskaris a CT Page 5204-Q proposed agreement dealing with a sale of Bickford. However, they did discuss that Naskaris would be paid if the D'Amore facilities were sold.
Shortly before May 4, 1990 Naskaris met with Chamberlain to discuss a possible buyout of his interest. In this meeting Chamberlain proposed that plaintiffs be paid $400,000 with respect to the sale of the two D'Amore Homes. Nothing was mentioned at that meeting in regard to Bickford. In early May counsel for defendants sent a proposed "Retirement Agreement" to Naskaris. This agreement set forth a proposal dealing with the fees to be paid for a sale of the D'Amore facilities (Plaintiffs' Ex. 4). No mention was made of the sale of Bickford.
Subsequently HCR's counsel prepared the first draft of the document which eventually led to the execution of the 1990 Agreement which is the subject of this action. The first draft was not signed by the parties, but at no time during any further discussions over this document or in any other negotiations did anyone ever indicate to the plaintiffs that their right to receive a fee for the sale of the D'Amore facilities would be conditioned on a sale of Bickford
At the hearing on February 1, 1996 Mr. Naskaris was asked whether he was surprised and what he thought when he saw the name Bickford on the final draft of the agreement which he signed in June 1990. He was also asked why he thought it was included in the agreement. He testified that he believed that Attorney Peter Wright, who was representing the AHF entity, had prepared the final version and put Bickford in there so that the plaintiffs would get a fee for that facility if it was sold to AHF. He testified that he was not surprised because if he introduced any facility to AHF which AHF bought, he would be paid 1.5% of the purchase price or bond proceeds. The defendants claim that they had asked that Bickford be included in the agreement. However, as stated above, at no time did defendants discuss such a provision with the plaintiffs.
In light of the evidence established at the hearing on February 1, 1996, the court holds that the ambiguous term set forth in plaintiffs' Exhibit 1 should be construed in favor of the plaintiffs for the following reasons:
• Naskaris was lead to believe on numerous occasions that plaintiffs would be paid if they arranged for the sale of the two CT Page 5204-R D'Amore facilities.
• Plaintiff Naskaris in fact had several meetings with the D'Amores and was instrumental in arranging the sale. The defendants were well aware of his efforts in this regard.
• During negotiations with the defendants or their attorney offers were made in regard to paying plaintiffs for the sale of the D'Amore facilities. No mention during these negotiations was made that payment for sale of the D'Amore facilities was conditioned on the sale of Bickford.
• Plaintiffs had nothing to do with the insertion of Bickford into the contract.
• Naskaris was not surprised to see the name Bickford in the contract because of his understanding with AHF that he would be paid for any facility which he introduced to AHF and which AHF purchased.
• Plaintiffs already had the rights to a one-third interest in any company formed by CKM to manage any healthcare facilities acquired by AHF. Naskaris also had a separate agreement with AHF for a finder's fee to any facilities which it acquired. Given these preexisting rights, it is not reasonable to assume that the 1990 agreement conditioned the payment of fees for the sale of the D'Amore facilities on the sale of Bickford.
The parties have stipulated that if defendant CKM Associates and its general partners are liable, the amount of the fee to which the plaintiffs are entitled, excluding prejudgment interest is $186,000. They have also stipulated that if the court determines that plaintiffs are entitled to recover prejudgment interest under section 37-3a of the Connecticut General Statutes, then the amount of prejudgment interest owed to the plaintiffs as of February 1, 1996 is $60,948.16. The court finds that the defendants' detention of the money from the plaintiffs was wrongful under the circumstances and that the plaintiffs are therefore entitled to prejudgment interest.
Accordingly, judgment may enter for the plaintiffs against the defendants for $186,000, plus $60,948.16 prejudgment interest, for a total of $246,948.16.
Allen, State Trial Referee CT Page 5204-S