GREGORY RADDING *v.* FREEDOM CHOICE
MORTGAGE, LLC, ET AL.
(AC 22017)

Dranginis, Bishop and West, Js.

---

Argued December 5, 2002—officially released April 29, 2003

*Jeffrey A. McChristian,* for the appellant (named defendant).

*Christopher M. Reeves,* for the appellee (plaintiff).

*Opinion*

WEST, J. The defendant Freedom Choice Mortgage, LLC (Freedom),[1] appeals from the judgment of the trial court rendered in favor of the plaintiff, Gregory Radding, in this breach of contract action. The court was called on to determine the effective dates of the plaintiff's membership in the defendant limited liability company for the purpose of deciding whether the plaintiff was entitled to certain remuneration arising from that membership. The defendant claims that the court improperly concluded (1) that the plaintiff became a nonequity member of Freedom on December 12, 1995, and (2) that the plaintiff did not cease being a member of Freedom on the termination of his employment.

Freedom is a limited liability company that was organized pursuant to the laws of the state of Connecticut

---

[1] Frank Noe, the principal owner of Freedom, also was named as a defendant. The action against him subsequently was withdrawn. We therefore refer in this opinion to Freedom as the defendant.

on September 26, 1994. Freedom is in the business of providing residential mortgages. Freedom hired the plaintiff as a commissioned loan representative in August, 1995. When the plaintiff began his employment, the terms and conditions of that employment were governed by an oral agreement. The plaintiff's work consisted of fielding telephone calls from persons interested in obtaining a mortgage, either to purchase a residence or to refinance an existing mortgage, and obtaining mortgage commitments from potential customers. The plaintiff was compensated on a commission basis, receiving a percentage of the fees generated on the closing of the mortgage loans.

In December, 1995, Freedom established a production bonus and profit sharing program for certain of its commissioned loan representatives. Freedom subsequently informed the plaintiff and certain other loan representatives about the production bonus and profit sharing program, and delivered to them the following documents: (1) a commissioned loan representative agreement (CLR agreement), (2) a workers' compensation coverage election form, (3) a copy of the "Operating Agreement of Freedom Choice Mortgage, LLC" (operating agreement), signed September 26, 1994, and (4) a copy of the first amendment to the operating agreement, dated December 12, 1995. The plaintiff signed the workers' compensation waiver form on December 22, 1995, and the CLR agreement on December 28, 1995. Pursuant to paragraph 7.2 of the operating agreement, no member of the company would be eligible to receive income from the production bonus or profit sharing programs until he or she had been a member for one full calendar year.

On December 13, 1996, the plaintiff and Freedom's principal owner had a heated telephone conversation that resulted in the plaintiff's termination of employment with the company. The plaintiff subsequently filed

this action, seeking, inter alia, damages for breach of contract for the company's refusal to award him production bonus and profit sharing payments. Central to the plaintiff's claims were the dates on which he became a nonequity member of Freedom and when he ceased to be a member.

The court found that Freedom's amendment of the operating agreement on December 12, 1995, made the plaintiff a nonequity member of the company as of that date. The court further found that the plaintiff continued in his capacity as a nonequity member loan representative following the termination of his employment with the company on December 13, 1996.[2] The parties stipulated that the properly calculated amounts for the disputed bonus and profit sharing would be as follows:[3]

| | |
|---|---|
| 1996 Production Bonus: | $6425.64 |
| 1996 Profit Sharing: | $955.00 |
| 1997 Profit Sharing: | $394.39 |
| 1998 Profit Sharing: | $623.98 |
| | $8399.01[4] |

I

Freedom first claims that the court improperly concluded that the plaintiff became a nonequity member of the company on December 12, 1995. We disagree.

---

[2] Although the court never expressly stated that the plaintiff did not cease being a member of Freedom, that conclusion is implicit in the court's finding that he never withdrew his membership and in the judgment awarding him unpaid profit sharing for the period through the end of 1998.

[3] Because production bonuses, though not profit sharing, were calculated on the basis of the amount of business each individual loan officer closed on during the previous year, the plaintiff concedes that he is not entitled to any production bonus for the time period following the termination of his employment, when he ceased to conduct business for the company.

[4] The parties stipulated to a total of $8409.01. That figure is a miscalculation of the total of the annual payments by $10.

The court found that the operative document for the purpose of establishing the date on which the plaintiff became a nonequity member of Freedom was the first amendment to the operating agreement, dated December 12, 1995. The defendant contends that the operative document for establishing the date of the plaintiff's nonequity membership is the commissioned loan representative agreement, which had an effective commencement date of December 21, 1995, and which the plaintiff did not sign until December 28, 1995. Under the defendant's interpretation, the plaintiff would not have been eligible to receive either profit sharing or production bonuses because, since his employment was terminated on December 13, 1996, he would have fallen one week short of the one year membership requirement.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct . . . ." (Citations omitted; internal quotation marks omitted.) *Issler* v. *Issler*, 250 Conn. 226, 235–36, 737 A.2d 383 (1999).

"The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. . . . The words used by the parties must be accorded their common meaning and usage where they can be sensibly applied to the subject matter of the contract. . . . The construction of a contract cannot be varied because of inconvenience to the parties. . . . The

intent expressed by the parties must be given effect." (Citations omitted; internal quotation marks omitted.) *Anderson* v. *Pension & Retirement Board*, 167 Conn. 352, 354–56, 355 A.2d 283 (1974).

The admission of members to a limited liability company is governed by the Connecticut Limited Liability Company Act, General Statutes §§ 34-100 through 34-242 (act). General Statutes § 34-179 (a) provides in relevant part: "Subject to subsection (b) of this section . . . a person may become a member in a limited liability company: (1) In the case of a person acquiring a limited liability company interest directly from the limited liability company, upon compliance with the operating agreement or, if the operating agreement does not so provide in writing, upon the written consent of at least a majority in interest of the members . . . ." Section 34-179 (b) provides: "The effective time of admission of a member to a limited liability company shall be the later of: (1) The date the limited liability company is formed; or (2) the time provided in the operating agreement, or if no such time is provided therein, when the person's admission is reflected in the records of the limited liability company."

In the present case, the plaintiff's admission clearly is reflected in schedule A to Freedom's operating agreement, as amended in accordance with the company's prescribed voting procedures. Paragraph 7.1 of the operating agreement states that "[t]he profits and losses of the company shall be allocated among the members in accordance with their respective percentage interests set forth on Schedule A attached hereto which may be amended from time to time by the majority vote of the members." Paragraph 7.2 of the operating agreement states that "[n]o person who becomes a member after the date of this Agreement, shall receive or be entitled to receive any distribution of profits until such person has been a member for one (1) full year

from *the date such person becomes a member which shall be set forth on said Schedule A."* (Emphasis added.)

As originally adopted, schedule A listed only two members, Frank Noe and Lois Noe. At a meeting held on December 12, 1995, the members of Freedom resolved to amend the operating agreement and schedule A to the operating agreement. The first amendment to the operating agreement, signed by both Frank Noe and Lois Noe and dated December 12, 1995, states in relevant part: "Schedule A labeled Members Interest *is hereby amended* as follows: See Schedule A Amendment dated December 12, 1995." (Emphasis added.) The amended schedule A lists, in addition to Frank Noe and Lois Noe, six new members, including the plaintiff. Each of the new members is listed as having a 1 percent membership interest.[5]

There is no indication that the amendment is to become effective only on the subsequent ratification of the new members or that the amendment is subject to any other condition precedent.[6] Indeed, such an interpretation would contradict the express language of paragraph 7.1 of the operating agreement, providing for the amendment of schedule A by majority vote of the extant members, as well as the express language of the first amendment to the operating agreement.

Nevertheless, the defendant argues that the amended operating agreement was intended to be read together

---

[5] To reflect the 6 percent distribution of membership interest to the new members, Frank Noe's membership interest was reduced proportionately and is listed as 93.90 percent.

[6] Despite the inclusion on schedule A of a column for the date of membership of the listed members, dates were never added. The only date included on the page is December 12, 1995. The defendant concedes, however, that all of the listed members did in fact become members at some point, although it argues that the effective date of that membership was subsequent to December 12, 1995. The defendant's failure to note the date of *any* subsequent admission to membership belies its argument.

with the CLR agreement and that the membership of the proposed new members was to be effective only on the signing of the CLR agreement by the respective loan officers. In support of that position, the defendant cites article VI, paragraph 6.1, of the operating agreement. Paragraph 6.1 states: "No member shall receive any salary or compensation of any kind, whether by virtue of being a member, manager or other officer except as shall be payable pursuant to a separate written employment agreement made with the consent of the Company or manager from time to time." The defendant asserts that the referenced written employment agreement is the CLR agreement.

Even if we were to credit the defendant's assertion that the operating and CLR agreements were meant to be read together, such an interpretation would not alter the disposition of the defendant's claim. The CLR agreement does not purport to establish an employee's status as a member. Paragraph 6.1 of the operating agreement also does not express an intention that membership is to be conditioned on an individual's signing the referenced written employment agreement. By its express terms, the operating agreement recognizes that the referenced employment agreement operates to establish the terms on which one who already is a member is to be compensated. Membership and the compensation deriving from that membership are treated as two distinct subjects.

Moreover, the conclusion that the plaintiff became a member of Freedom on the date that the operating agreement was amended, and that such membership was independent of the CLR agreement, is further buttressed by the language contained in the workers' compensation coverage selection form provided to the plaintiff by the defendant on or about December 21, 1995. The relevant language states: "I Gregory S. Radding, *a member at Freedom Choice Mortgage LLC*

located at 30 East Main Street Avon, [CT] 06001, *who am also a member, of said LLC,* hereby elect to: be excluded from coverage under the Worker's Compensation law under P.A. 491." (Emphasis added.) The form is signed and dated December 22, 1995, six days prior to the plaintiff's signing of the CLR agreement.

On the basis of the foregoing, we conclude that the court correctly concluded that the plaintiff became a member of Freedom effective December 12, 1995.

II

The defendant also claims that the court improperly found that the plaintiff did not cease being a member of Freedom following the termination of his employment as a loan representative with the company.[7] We disagree.

As with the previous claim, because there is definitive contract language to guide our disposition of the issue, we are presented with a question of law and, therefore, our review of the present claim is plenary. See *Issler* v. *Issler,* supra, 250 Conn. 235–36; *Anderson* v. *Pension & Retirement Board,* supra, 167 Conn. 354–56. Paragraph 9.3 of the operating agreement states that "[a] person ceases to be a member of the Company upon the occurrence of any of the events of disassociation set forth in the Connecticut Limited Liability Company Act [§§ 34-100 through 34-242] (the 'Act')." General Statutes § 34-180 (a) provides in relevant part: "[A] person ceases to be a member of a limited liability company upon the occurrence of one or more of the following events: (1) The member withdraws by voluntary act from the limited liability company . . . (3) the member is removed as a member (A) in accordance with the operating agreement, or (B) unless otherwise provided in writing in the operating agreement, when the member

---

[7] See footnote 2.

assigns all of his interest in the limited liability company with the written consent or by an affirmative vote of a majority in interest of the members who have not assigned their interests . . . ." Section 34-180 (b) provides that "[t]he members may provide in writing in the operating agreement for other events the occurrence of which result in a person ceasing to be a member of the limited liability company."

Thus, a member may cease being a member when he (1) voluntarily withdraws from the limited liability company, (2) is removed by a majority vote of the extant members or (3) assigns all of his interest in the company. The court found, and we agree, that none of those events applied to the present case.

Freedom argues that the plaintiff was removed as a member as a result of his name being removed from schedule A by Frank Noe.[8] The defendant argues that such action was in accordance with the applicable provisions of the operating agreement, specifically article VII, paragraph 7.1, and article V, paragraphs 5.1 and 5.2.[9] We disagree.

---

[8] We note that this is a different ground than that presented at trial. At trial, the defendant argued that the plaintiff ceased to be a member of the company as a result of his voluntary termination of his employment with Freedom. The court concluded that such action did not comport with the requirements of the act because the plaintiff did not provide written notice of his intention to withdraw from membership in the company.

[9] Paragraphs 5.1. and 5.2, covering management of the company, provide no assistance to the defendant. Paragraph 5.1 states: "The management and general overall supervision of the business and affairs of the Company shall be vested in a manager who shall be the chief executive officer of the Company."

Paragraph 5.2 states: "The manager shall take all such action or actions to carry out the business, affairs, and purposes of the Company which the manager deems to be in the best interest of the Company or as permitted by Connecticut law."

It is beyond peradventure that those clauses cannot be read to convey authority to do that which is in contradiction to the express requirements of other clauses of the agreement. See *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 273, 670 A.2d 880 (contract clauses must be construed in such a way as to reconcile

Paragraph 7.1 of the operating agreement states that "[t]he profits and losses of the company shall be allocated among the members in accordance with their respective percentage interests set forth on Schedule A attached hereto which may be amended from time to time by the majority vote of the members." The defendant argues that because Frank Noe individually held a majority of the membership interest, his unilateral alteration of schedule A effectively operated as a majority vote for the purpose of amending the operating agreement. The defendant's argument ignores the fact that there is no evidence that any vote of the members actually occurred. Although, given Frank Noe's majority interest, the outcome of such a vote may have been a foregone conclusion, the voting procedures established by the operating agreement cannot be so cavalierly disregarded.[10] "Parties do not ordinarily insert meaningless provisions in their agreements and, therefore, if it is reasonably possible to do so, every provision must be given effect." (Internal quotation marks omitted.) *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 273, 670 A.2d 880, cert. denied, 236 Conn. 915, 673 A.2d 1143 (1996); *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.*, 32 Conn. App. 530, 534, 630 A.2d 115 (1993). In the present case, the operating agreement expressly sets forth the procedures governing member voting. Paragraph 12.1 of the agreement states: "In all matters for which a vote of the members is required by this Agreement or by the Act, each member shall be entitled to the number of votes equivalent to his percentage

apparent inconsistencies "because it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions"), cert. denied, 236 Conn. 915, 673 A.2d 1143 (1996). A contrary reading would render paragraph 12.1 superfluous.

[10] Compare the requirements of article III, providing that the termination of *the company* may be effected on the "*written consent* of at least a majority in interest of the members." (Emphasis added.)

interest in the company. All members may vote for all matters for which a vote is required by this Agreement or the Act, or for which a vote is requested at any member's meeting, unless a member's vote is specifically excluded by the terms of this Agreement." Because paragraph 7.1 of the operating agreement requires a majority vote of the members to amend schedule A of the operating agreement and no such vote took place, we conclude that the court properly found that the plaintiff did not cease to be a member of Freedom following the termination of his employment as a loan representative.

The judgment is affirmed.

In this opinion the other judges concurred.