## HILB ROGAL AND HOBBS COMPANY ET AL. *v.* UTA PETERS RANDALL
### (AC 29572)

Bishop, DiPentima and Gruendel, Js.

Argued January 8—officially released June 16, 2009

*Sheila A. Huddleston*, with whom were *Glenn M. Cunningham* and, on the brief, *Lee A. Duval*, for the appellants (plaintiffs).

*Scott S. Centrella*, with whom, on the brief, was *Jonathan J. Kelson*, for the appellee (defendant).

*Opinion*

BISHOP, J. The plaintiffs, Hilb Rogal & Hobbs Company (Hilb) and Hobbs Group, LLC (Hobbs), appeal from the judgment of the trial court in favor of the defendant, Uta Peters Randall, in an action for the enforcement of a nonsolicitation agreement in an employment contract. On appeal, the plaintiffs claim that the court improperly determined that the nonsolicitation agreement was unenforceable and meaningless. We reverse the judgment of the trial court.

Trial evidence adduced the following relevant facts accepted by the court as proven. Hilb, an insurance brokerage firm, and Hobbs, a wholly owned subsidiary of Hilb, brought this action against the defendant, their former employee, to enforce a nonsolicitation covenant included in a 1997 employment agreement. The defendant was employed by the plaintiffs for more than eighteen years as an insurance broker before her resignation

became effective on October 15, 2005. Shortly thereafter, the defendant accepted a broker position with a competitor, Beecher Carlson Risk Management, Inc. (Beecher Carlson).

The agreement, which is the foundation of the plaintiffs' claim, is titled "Employment, Non-Solicitation, and Confidentiality Agreement," and was signed by the defendant and her then employer, Hobbs, on October 22, 1997, when the defendant had been employed by Hobbs for more than ten years. By its terms, the employment agreement inures to the benefit of Hobbs and "any of its subsidiaries, affiliates or successors." The employment agreement was signed by the defendant and Thomas A. Golub, who was then Hobbs' president and chief executive officer. It is clear from the evidence that signing the agreement was a condition of the defendant's continuing employment with Hobbs. Indeed, the preamble to the employment agreement recites: "I understand that if I do not enter into this Agreement, the Company would not employ me."

The principal issue at trial involved paragraph six of the employment agreement, which reads: "6. Agreement Not to Solicit. As a condition to my hiring and continued employment by the Company, and in consideration of the compensation to be paid to me hereunder, I agree that, during the period I am employed by the Company and for a period of six months following the termination of such employment, followed by a second six-month period, followed by a third six-month period, followed by a fourth six-month period:

"(a) Directly or indirectly solicit for employment any person who is an employee of the Company, unless the Company first terminates the employment of such employee or the Company gives written consent to such employment or offer of employment;

"(b) Call on or, directly or indirectly, solicit, divert, or take away insurance-related business from the Company, or, directly or indirectly, accept insurance-related business from, provide insurance-related consulting services of any kind to, or perform any of the services offered by the Company for, any person, firm, corporation or other entity who is a customer of the Company or who is, or during the two-year period prior to my termination of employment was, a prospective customer of the Company with whom I had direct contact, or, directly or indirectly, encourage any such customer to cease doing business with the Company."

From this language, it is apparent that paragraph six does not set forth an express promise by the employee not to engage in the activities described in subparagraphs (a) and (b). Instead, paragraph six is missing operative language. Paragraph nine of the employment agreement provides that if any commission or fee became payable to anyone as a result of the violation of paragraph six of the agreement, Hobbs would be entitled to recover 80 percent of such fees over a two year period as damages from the employee. Paragraph thirteen contains an undertaking by the employee to reimburse the employer for any attorney's fees incurred in enforcing the provisions of the employment agreement. Finally, paragraph eighteen provides that the employment agreement is to be construed and enforced in accordance with Connecticut law.

In June, 2002, Hobbs was acquired by Hilb, Rogal and Hamilton Company, which subsequently changed its name to Hilb Rogal & Hobbs Company. In connection with that transaction, the defendant signed an acknowledgment and amendment agreement that provided that the employment agreement remained in effect and recognized that following the closing of the acquisition, Hilb would be included within the definition of the term "Company." The acknowledgment and amendment

agreement simply repeated the language of paragraph six without recognizing or addressing its lack of promissory language.

While employed at Hilb, the defendant was actively involved in providing services to Staples, the office supply retailer. In the course of her involvement with the Staples account, the defendant developed a close personal and professional relationship with Staples' risk manager, Deborah Harder. During the years that the defendant was assigned to the Staples account, it became customary for her to meet with Harder and the Staples' risk management team each December for a social dinner in Boston.

On September, 28, 2005, the defendant informed Hilb management of her resignation effective October 15, 2005. The defendant resigned to accept a position with Beecher Carlson, a Hilb competitor. After leaving Hilb, the defendant remained in touch with Harder, whom she treated to dinner on December 7, 2005, in Boston. The cost of the evening was billed to Beecher Carlson. Shortly after the December, 2005 dinner, Hilb learned that the defendant had met with Harder, and Hilb and Hobbs commenced litigation. In their verified complaint, filed December 27, 2005, the plaintiffs alleged that the defendant was actively soliciting business from Hilb customers, in particular, Staples, in violation of the employment agreement. The complaint sought temporary and permanent injunctions enjoining the defendant from soliciting Hilb clients or providing insurance related consulting services to them in violation of paragraph six of the employment agreement.

Although Staples renewed its casualty insurance account with Hilb in February, 2006, Harder began meeting in November, 2006, with other insurance brokers in an effort to seek out different representation,

and on December 7, 2006, Harder met with the defendant and listened to her presentation on behalf of Beecher Carlson. Harder then decided to replace Hilb with Beecher Carlson for both programs immediately and on December 15, 2006, issued a "broker of record" letter informing Staples' insurance carriers that Beecher Carlson was Staples' new insurance broker. Staples' decision to switch insurance brokers in December, 2006, resulted in additional fees to Beecher Carlson in the amount of $500,000 to $550,000 a year and a corresponding loss of fees to the plaintiffs.

On January 3, 2008, the court issued its memorandum of decision, finding that the defendant did not breach the employment agreement because the contract was missing the promissory words necessary to make enforceable the provisions found under paragraph six of the employment agreement, titled "Agreement Not to Solicit." The court further found that because the plaintiffs failed to request a reformation of the contract to add the omitted words, the court could not supply them, thereby making the contract enforceable. After the plaintiffs moved for an articulation of the court's decision, on April 30, 2008, the court articulated that it "did not find the provisions of paragraph six to be ambiguous," however, "[i]n the absence of the prohibitory language, paragraph six is . . . meaningless." The court further found that "the plaintiffs needed to have the contract equitably reformed if it wished to have omitted terms added to the contract." This appeal followed. Additional facts will be set forth as necessary.

The plaintiffs' sole claim on appeal is that the court improperly failed to enforce the plain meaning of the nonsolicitation agreement found under paragraph six of the employment agreement. The plaintiffs contend that although paragraph six erroneously omits prohibitory language, the provision's two year solicitation prohibition is evident in the context of the entire contract.

The plaintiffs further contend that the defendant breached her obligations under paragraph six of the employment agreement by soliciting the business of Staples at a December 7, 2006 meeting. The court noted in its decision that it had "no trouble in finding that the defendant's attendance at the December 7, 2006 sales presentation to Staples constituted solicitation of a customer of the plaintiffs, with whom she had contact while she was employed by the plaintiffs." The court concluded, however, that the "problem with the plaintiffs' nonsolicitation claim lies in the wording of paragraph six and the plaintiffs' failure to assert or to prove a claim for reformation of that portion of the employment agreement."

We begin our analysis with the well established standard of review for the interpretation of a contract. "When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Because a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record. . . .

"The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . .

the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Citations omitted; internal quotation marks omitted.) *WE 470 Murdock, LLC* v. *Cosmos Real Estate, LLC*, 109 Conn. App. 605, 608–609, 952 A.2d 106, cert. denied, 289 Conn. 938, 958 A.2d 1248 (2008).

"When interpreting a contract, we construe the contract as a whole and all relevant provisions are considered when determining the intent of the parties." *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 272, 670 A.2d 880, cert. denied, 236 Conn. 915, 673 A.2d 1143 (1996). "The law prefers an interpretation which gives effect to all parts of the contract rather than one which leaves a portion of the contract ineffective or meaningless." 11 S. Williston, Contracts (4th Ed. Lord 1999) § 32:9, p. 440. Additionally, "[a] written contract should be construed according to the obvious intention of the parties, notwithstanding clerical errors or inadvertent omissions therein, which can be corrected by perusing the whole instrument. . . . If an improper word has been used or a word omitted, the court will strike out the improper word or supply the omitted word if from the context it can ascertain what word should have been used." 17A Am. Jur. 2d 361, Contracts § 373 (2004).

Applying these accepted principles of contract interpretation to the present case, we find that although the nonsolicitation agreement set forth in paragraph six is

missing operative language, the agreement is not ambiguous because it clearly expresses the parties' intent to bar solicitation. Here, the title of the employment agreement is "Employment, Non-Solicitation, And Confidentiality Agreement." The title of paragraph six is "Agreement Not to Solicit." Thereafter, the agreement reads: "As a condition to my hiring and continued employment by the Company, and in consideration of the compensation to be paid to me hereunder, I agree that, during the period I am employed by the Company and for a period of six months following the termination of such employment, followed by a second six-month period, followed by a third six-month period, followed by a fourth six-month period . . . ." The agreement then reads: "(a) Directly or indirectly solicit for employment any person who is an employee of the Company . . . (b) Call on or, directly or indirectly, solicit, divert, or take away insurance-related business . . . ." Paragraph six erroneously omitted prohibitory language such as "I shall not" or "I will not" before subsections (a) and (b). Despite the missing language, it is clear from the title of the employment agreement, the title of paragraph six and the language found under paragraph six that the parties intended that the defendant would be prohibited from engaging in solicitation for two years. See *Bialowans* v. *Minor*, 209 Conn. 212, 218, 550 A.2d 637 (1988) (section headings made contract's intent clear and unambiguous). Further, paragraph nine of the employment agreement, titled "Certain Commissions and Fees," imposes fees for violations of paragraph six. The fact that the employment agreement imposes remedies for violations of paragraph six further evidences that paragraph six was intended to prohibit certain conduct.

The court concluded that the only way to add the omitted prohibitory language to the employment agreement would be to reform the contract, and the

court found that the plaintiffs were barred from such relief because they never specifically requested reformation. "An action for reformation rests on the equitable theory that the instrument sought to be reformed does not express the intention of the parties because it was executed as the result of mutual mistake or unilateral mistake coupled with fraud or inequitable conduct on the part of the other party." *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, supra, 40 Conn. App. 273. Contrary to the trial court, we do not believe that the contract at hand needed to be reformed for the court to be empowered to supply an obvious missing term consistent with the clear intent expressed in the balance of the contract language.

We recognize that before reformation can be granted by the court, equitable relief must specifically be requested by the plaintiff. Practice Book § 10-27.[1] Nevertheless, "[i]n many instances, words used by the parties in their writing are not particularly suitable to express their meaning, but they are nevertheless capable of being interpreted, even without an actual physical reformation of the contract. . . . In such a case no equity power is required." (Internal quotation marks omitted.) *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, supra, 40 Conn. App. 273–74. Because the intent of the nonsolicitation agreement is plain from an objective reading of the contract, a request for reformation is not necessary to enforce the provision. Id., 273. "[I]n order to carry out the contracting parties' intention, the contract's words may be interpolated, transposed or even rejected. For the same reason, words may be supplied by the court." 11 S. Williston, supra, § 32:9, pp. 442–43. In this instance, the court could have supplied the missing prohibitory

---

[1] Practice Book § 10-27 provides: "A party seeking equitable relief shall specifically demand it as such, unless the nature of the demand itself indicates that the relief sought is equitable relief."

language to carry out the parties' clear intention without resorting to the equitable remedy of reformation.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.