INTERNATIONAL MARINE HOLDINGS, INC. *v.*
MICHAEL F. STAUFF ET AL.
(15365)

Dupont, C. J., and Landau and Spear, Js.

Argued January 14—officially released April 8, 1997

*James M. Hall, Jr.*, with whom were *Charles R. Andres* and, on the brief, *Jacqueline D. Bucar* and *Daniel R. Warncke*, for the appellant (plaintiff).

*George P. Birnbaum*, for the appellee (named defendant).

SPEAR, J. The plaintiff, International Marine Holdings, Inc., appeals from the judgment of the trial court confirming an arbitration award in favor of the defendant Michael Stauff.[1] This dispute arose out of the plaintiff's termination of the defendant's employment as chief financial officer. The plaintiff claims that the trial court improperly (1) found that an arbitration clause in the employment agreement between the parties provides for the arbitrators to decide the issue of arbitrability, (2) concluded that the plaintiff's claims that the defendant breached his fiduciary duties as an officer and director were matters that arose out of the employment agreement and were thus arbitrable, and (3) con-

---

[1] The plaintiff named Michael Stauff and the American Arbitration Association as defendants in its original complaint. In this opinion we refer to Stauff as the defendant.

cluded that the defendant's claims were arbitrable despite the plaintiff's claim that a termination for cause is excepted from the arbitration clause. We affirm the judgment of the trial court.

The record discloses the following facts and procedural history. The defendant was the plaintiff's vice president of finance and chief financial officer. On January 1, 1992, the parties entered into an amended employment contract. The contract contained an arbitration clause,[2] which provides in pertinent part: "Any contro-

[2] The arbitration clause in the employment contract provides: "Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, shall, except as provided in Section 10, be settled by arbitration in accordance with the rules of the American Arbitration Association then in effect and judgment upon such award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration shall be held in Fairfield County, Connecticut. The arbitration award shall include attorneys' fees and costs to the prevailing party."

Section 10 of the employment contract provides: "Equitable Relief. In the event of a breach or threatened breach by the Executive of any of the provisions of Sections 7 [Confidential Information], 8 [Intellectual Property] or 9 [Interference with the Company] of this Agreement, the Executive hereby consents and agrees that the Company shall be entitled to an injunction or similar equitable relief from any court of competent jurisdiction restraining the Executive from committing or continuing any such breach or threatened breach or granting specific performance of any act required to be performed by the Executive under any of such provisions, without the necessity of showing any actual damage or that money damages would not afford an adequate remedy and without the necessity of posting any bond or other security. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies at law or in equity which it may have."

Section 7 of the employment contract provides in pertinent part: "Confidential Information.

"7.1 The Executive shall, during the Executive's employment with the Company and thereafter, treat all confidential material confidentially and, except in accordance with the terms of this Agreement, shall not, without the prior written consent of a majority of the Board of Directors of the Company, disclose such material, directly or indirectly, to any party not at the time of such disclosure an employee or agent of the Company. . . ."

Section 8 of the employment contract provides in pertinent part: "Intellectual Property. Any and all inventions made, developed or created by the Executive (whether at the request or suggestion of the Company or other-

versy or claim arising out of or relating to this Agreement, or any breach thereof, shall, except as provided in Section 10, be settled by arbitration . . . ."[3]

On April 29, 1994, the plaintiff terminated the defendant's employment. On May 5, 1994, pursuant to his employment contract, the defendant filed a demand for arbitration with the American Arbitration Association. On May 23, 1994, the plaintiff filed an action in the trial court seeking to enjoin the arbitration. In addition, the plaintiff sought damages for the defendant's alleged breaches of fiduciary duties as an officer and director. The trial court stayed the action to allow the panel of arbitrators to determine the question of arbitrability. The panel then granted the plaintiff's request for a preliminary hearing concerning jurisdiction. After reviewing the briefs and arguments, the panel determined that the issues before it were arbitrable. After a lengthy arbitration, the panel awarded the defendant his full severance pay, attorney's fees and arbitration fees. The arbitrators dismissed all of the plaintiff's claims against the defendant.

wise, whether alone or in conjunction with others, and whether during regular hours of work or otherwise) during the term of his Agreement which may be directly or indirectly useful in, or relate to, the business of or tests being carried out by the Company, shall be promptly and fully disclosed by the Executive to the Board of Directors of the Company and shall be the Company's exclusive property as against the Executive. . . ."

Section 9 of the employment contract provides in pertinent part: "Interference with the Company. The Executive acknowledges that the services to be rendered by him to the Company are of a special and unique character. The Executive agrees that, in consideration of his employment hereunder, the Executive will not . . . (i) solicit or entice or endeavor to solicit or entice away from the Company any employee of the Company . . . or (ii) solicit or entice or endeavor to solicit or entice away from the Company any present customer . . . or (b) at any time, take any action or make any statement the effect of which would be, directly or indirectly, to impair the good will of the Company or the business reputation or good name of the Company, or be otherwise detrimental to the interests of the Company . . . ."

[3] Neither party claims that § 10 is applicable to this dispute.

On May 24, 1995, the defendant moved to confirm the arbitration award and the plaintiff filed a motion to vacate the award. The trial court granted the defendant's motion to confirm and denied the plaintiff's motion to vacate. This appeal followed.

I

The plaintiff claims that the trial court improperly referred the issue of arbitrability to the arbitrators because the arbitration clause was not broad enough to encompass that issue. We disagree.

Whether a particular dispute is arbitrable is typically a question for the court. *Welch Group, Inc.* v. *Creative Drywall, Inc.*, 215 Conn. 464, 467, 576 A.2d 153 (1990). " 'It is well established [however] that arbitration is a matter of contract and that parties may agree to have questions concerning the arbitrability of their disputes decided by a separate arbitrator.' " *Combustion Engineering, Inc.* v. *International Brotherhood of Boilermakers*, 15 Conn. App. 332, 333, 544 A.2d 256 (1988). "In apportioning, between the court and the arbitrators, the responsibility for determining which disputes are arbitrable, the language of the contract controls and determines whether the arbitrability of a dispute is for the court or the arbitrators." *Emcon Corp.* v. *Pegnataro*, 212 Conn. 587, 592, 562 A.2d 521 (1989). "The intention to have arbitrability determined by an arbitrator can be manifested by an express provision or through the use of broad terms to describe the scope of arbitration, such as all questions in dispute and all claims arising out of the contract or any dispute that cannot be adjudicated." (Internal quotation marks omitted.) *Welch Group, Inc.* v. *Creative Drywall, Inc.*, supra, 467; see also *Board of Education* v. *Frey*, 174 Conn. 578, 581, 392 A.2d 466 (1978). The arbitration clause at issue here is a broad one: "*Any* controversy or claim arising out of or relating to this Agreement, or any breach thereof,

*shall,* except as provided in Section 10, be settled by arbitration . . . ." (Emphasis added.)

Despite the broad language of the arbitration clause, the plaintiff asserts that the exclusionary language of the arbitration clause "makes it clear that not all claims arising under the Employment Agreement were to be arbitrated." In *Combustion Engineering, Inc.* v. *International Brotherhood of Boilermakers,* supra, 15 Conn. App. 335, this court rejected a similar claim. The parties' agreement provided a broad arbitration clause[4] that contained limited exclusionary language. This court held that in light of the entire arbitration clause, "the question of arbitrability [did not fall] within the ambit of that exclusionary language so as to preclude the arbitrator from deciding questions of arbitrability." Id. In this case, neither party claims that this dispute falls within § 10 of the agreement. The plaintiff concedes that the exclusionary language does not explicitly exclude arbitrability from the scope of the arbitrators' authority. Furthermore, the exclusionary language included in the arbitration clause refers only to the plaintiff's ability to seek equitable relief for breaches of the agreement concerning confidential information, intellectual property or interfering with the company. We conclude that the arbitration clause was broadly drafted to include the issue of arbitrability and the exclusionary language does not preclude the arbitrators from deciding questions of arbitrability.

## II

The plaintiff also asserts that this dispute was not arbitrable because in its complaint, the plaintiff alleged that the defendant breached his fiduciary duties as an

---

[4] That clause provided: "It is specifically agreed that in the event any dispute arises out of the interpretation or application of this agreement, excluding questions of jurisdiction of work, the same shall be settled by means of the procedure set out herein."

officer and director. The plaintiff maintains that because the employment agreement relates only to the defendant's role as an employee, the parties did not agree to arbitrate a dispute involving the defendant's role as a director, and, as such, the dispute is not governed by the arbitration clause contained in the employment agreement. This claim is without merit.

In paragraphs one through fifteen of its complaint, the plaintiff recited various factual allegations.[5] In these

[5] The complaint states in pertinent part: "Plaintiff INTERNATIONAL MARINE HOLDINGS, INC. ('IMH') for its Complaint against MICHAEL F. STAUFF ('Stauff') and the American Arbitration Association ('AAA'), states as follows:

"1. IMH is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Guilford, Connecticut. It is holding company with numerous subsidiaries engaged in the marine accessories business including marine electronics, galley equipment, spars, rigging, and deck hardware.

"2. Stauff was at all times mentioned herein a resident of Monroe, Connecticut and, as set forth below, Stauff has functioned as IMH's Vice President of Finance and Chief Financial Officer.

"3. AAA is a not-for-profit corporation organized to provide dispute resolution services and has offices in East Hartford, Connecticut.

"4. IMH is a privately held company whose principal shareholder (holding in excess of 90% of the shares) at all times referred to was IFEM, S.p.A. ('IFEM'), a corporation organized and existing under the laws of Italy whose principal place of business is in Milano, Italy. IFEM is a wholly owned a subsidiary of ISVIM, S.p.A. which, in turn, is a subsidiary of Ferruzzi Finanziaria S.p.A. ('Ferruzzi'). The remaining shares if IMH were owned by a number of individuals including Defendant Stauff.

"5. Pursuant to an Amended and Restated Employment Agreement dated as of the first day of January, 1992 (hereinafter the 'Employment Agreement'), Stauff was employed by IMH as its Vice President of Finance and Chief Financial Officer. Under that Employment Agreement, Stauff was to perform faithfully and diligently such duties and responsibilities appropriate to his position.

"6. In willful gross neglect of his obligations under the Employment Agreement, and in willful gross misconduct Stauff repeatedly and consistently failed to fulfill his duties and responsibilities in numerous respects including but not limited to the following:

"a. Stauff failed to maintain IMH's financial statements and records in a manner consistent with generally accepted accounting practices but, to the contrary, authorized and approved substantial deviations from those practices;

paragraphs, the plaintiff makes no reference to the defendant's position as a director. In the third count,

"b. Stauff authorized or permitted the commingling of Company funds with officers' funds;

"c. Stauff authorized or permitted the expenditure of Company funds for legal and other services rendered to officers of IMH in their individual capacities, and Stauff permitted the use of corporate assets to defray the cost of a Searay boat titled in the name of John E. D. Grunow, Jr. ('Grunow'), IMH's then Chief Executive Officer;

"d. Stauff authorized numerous foreign currency exchanges for no apparent business purpose but at increased cost and losses to IMH;

"e. Stauff authorized international payments and transfers of funds overseas, including fund transfers to Swiss bank accounts, without necessary documentation of the business purpose for such payments and transfers or the ultimate disposition of such funds;

"f. Stauff failed to implement and maintain reasonable accounting controls with respect to the submission and approval of expenses charged to and paid by IMH. As a consequence, IMH: reimbursed officers and employees of the Company for travel and entertainment expenses without presentation of proper accounts; paid excessive legal fees which were tendered without substantiation and which, in whole or in part, were charged to incorrect Company accounts; and, paid credit card and other bills submitted to the Company without proper documentation of their business purpose;

"g. Stauff authorized or permitted the hiring of and payments to various consultants including investment and accounting counselors without justification and at substantial expense to IMH;

"h. Stauff authorized or permitted payments of compensation to individuals for which no services were provided to IMH;

"i. Stauff authorized or permitted IMH to make prepayments for services contrary to IMH's business interests;

"j. Stauff failed and refused to provide financial and other information to IMH's Board of Directors and majority shareholder despite reasonable requests therefor; and

"k. Stauff refused to provide IMH's auditor, Arthur Anderson & Co., information essential to its auditing function upon request and otherwise attempted to interfere with the proper performance of Arthur Anderson's audit.

"7. Further, since the summer of 1992, Stauff, individually and in cooperation with others including Grunow, pursued a scheme to reduce the value of IMH and facilitate an attempt to seize ownership and control of IMH and its subsidiaries.

"8. In furtherance of this scheme, Stauff, individually and in cooperation with Grunow and others, engaged in the following acts:

"a. In 1993, without the knowledge or consent of IMH's majority shareholder or its Board of Directors, established Eumenes Corporation as a wholly-

the plaintiff incorporated paragraphs one through fifteen, and alleged the conclusion that "[a]s an officer

owned subsidiary of IMH. Organizing Eumenes Corporation was contrary to the express direction of IMH's Board and majority shareholder and further was in violation of its Certificate of Incorporation and IMH's Bylaws;

"b. Having so established Eumenes without the knowledge of IMH's Board or its majority shareholder, transferred real and intangible assets of IMH or its subsidiaries to Eumenes;

"c. Reduced the value of such assets for financial statement purposes, in order to, on information and belief, sell such assets to other entities or otherwise convert such assets;

"d. Sought to take control of IMH's successful subsidiary Lewmar, through a scheme of reducing the book value of Lewmar's assets, discharging Lewmar executives Huggett and Blackwood, and investigating the transfer of Lewmar's trademark rights to another party, contrary to IMH's By-Laws.

"9. This scheme to take control of IMH and Lewmar culminated in a proposed 'management buy-out' of IMH using financing from the New York investment group Three Cities Research, Inc. ('Three Cities'). Stauff, having authorized and permitted the devaluation of certain assets of IMH and having deliberately misrepresented IMH's financial condition and fair market value to its majority shareholder, in cooperation with Grunow and others proposed to buy all of the interest of Ferruzzi and its subsidiaries in IMH for substantially less than its true market value, which amount was also substantially less than the sums Ferruzzi and its subsidiaries had invested in and loaned to IMH.

"10. On January 24, 1994 an Agreement in Principle was signed by IMH Holdings, Inc. (a company formed and to be owned by Stauff, Grunow, and others), Three Cities, and Ferruzzi; Ferruzzi entered into the Agreement in Principle in reliance upon Defendant's representations concerning the market value and financial condition of IMH. Under the Agreement, IMH Holdings and Three Cities were to purchase IMH by March 31, 1994.

"11. Defendants' efforts to purchase IMH and capitalize on the scheme to devalue and take control of the company was thwarted when Three Cities determined in their review of IMH that Stauff, Grunow and others had deliberately misrepresented the financial status of IMH and had mismanaged business operations of the company. Accordingly, Three Cities announced that it would not go forward with the Agreement in Principle.

"12. The foregoing acts and omissions of Stauff constitute willful, gross neglect, willful, gross misconduct and other grounds for IMH to terminate Stauff's employment for cause. On April 29, 1994 IMH's Board, through its Chairman Allesandro Bonetti, gave Stauff notice of the termination of his employment with IMH for cause.

"13. Subsequently, on or about May 5, 1994, Stauff filed a Demand for Arbitration with the American Arbitration Association requesting the arbitration of Stauff's termination of employment with IMH.

and *director* of [the plaintiff, the defendant] owed a duty of loyalty and faithfulness to [the plaintiff]. The foregoing acts [paragraphs one through fifteen] on [the defendant's] part constitute a breach of his fiduciary duties to [the plaintiff] . . . ." (Emphasis added.)

The plaintiff has failed to differentiate its allegations and evidence concerning the defendant's role as an employee from his roles as an officer and director. To accept the plaintiff's contention would be to eviscerate the arbitration clause. By alleging that all of the acts were done by the defendant in his multiple capacity as an employee, officer and director, the plaintiff would effectively insulate all of the claims from arbitration. All of the plaintiff's factual allegations, even if true, could have been performed by the defendant in his capacity as an employee. After a careful review of the pleadings, transcripts and motions, we conclude that the allegations comprising the plaintiff's claim arise out of or relate to the employment agreement.

## III

The plaintiff finally claims that this dispute was not arbitrable because of the express terms of the employment agreement contained in § 6.3.[6] We disagree.

---

"14. The Employment Agreement between IMH and Stauff does not provide for arbitration regarding a termination for cause as that term is defined under the Employment Agreement, and thus, the parties to the Employment Agreement did not agree to arbitrate a claim or dispute concerning IMH's termination of Stauff under the circumstances of this case.

"15. The AAA has acknowledged receipt of Stauff's Demand for Arbitration and has given instructions to Stauff and IMH on how to proceed under AAA rules."

[6] Section 6.3 of the employment agreement provides: "The employment of the Executive hereunder may be terminated by the Company at any time for Cause (as hereinafter defined). In the event of such termination, the Company shall pay to the Executive the base salary provided for in Section 3 (at the annual rate then in effect) accrued to the date of such termination and not theretofore paid to the Executive and the bonus provided in Section 3.4 prorated through the date of such termination. Rights and benefits of the Executive under the benefit plans and programs of the Company shall

Section 6.3 of the employment agreement provides specific rights, obligations and procedures to be followed in the event of a termination for cause. The plaintiff asserts that the defendant was terminated for cause, and that, pursuant to the employment agreement, the right to arbitrate did not survive a termination for cause. The plaintiff bases its claim on the following language contained in § 6.3: "Neither the executive nor the company shall have any further rights or obligations under this Agreement except as provided in Sections 7, 8, 9, 10 and 17." The plaintiff asserts that the only rights and obligations that survive a termination for cause are the plaintiff's ability to obtain equitable relief for breaches of the contract provisions concerning confidential information (§ 7), intellectual property (§ 8), interfering with the company (§ 9), and the defendant's rights to an advance of defense expenses (§ 17).

First, we note the broad nature of the arbitration clause as discussed in part I of this opinion. The arbitra-

---

be determined in accordance with the provisions of such plans and programs. For purposes hereof, 'Cause' shall include (a) willful gross neglect or willful, gross misconduct in the Executive's discharge of his duties and responsibilities under this Agreement, or (b) the Executive's commission of (i) a felony or (ii) any crime or offense involving moral turpitude; provided, however, that the Executive shall be given written notice by a majority of the Board of Directors of the Company that it intends to terminate the Executive's employment for Cause which written notice shall specify the act or acts upon the basis of which the majority of the Board of Directors of the Company intends so to terminate the Executive's employment, and the Executive shall then be given the opportunity, within fifteen (15) days of his receipt of such notice, to have a meeting with the Board of Directors of the Company to discuss such act or acts. If the basis of such written notice is other than an act or acts described in subsection (b), the Executive shall be given fifteen (15) days after such meeting within which to cease or correct the performance (or nonperformance) giving rise to such written notice and, upon failure of the Executive within such fifteen (15) days to cease or correct such performance (or nonperformance), the Executive's employment by the Company shall automatically be terminated hereunder for Cause. Neither the Executive nor the Company shall have any further rights or obligations under this Agreement, except as provided in Sections 7, 8, 9, 10 and 17.

tion clause does not expressly exclude § 6.3 from arbitration, leading us to conclude that the parties intended that disputes arising out of that section are arbitrable.

Furthermore, § 6.3 does not address the question of *remedies* for the defendant in the event of a breach of § 6.3 by the plaintiff, except for the § 17 provision for an advance of counsel fees in certain situations. Even if the defendant were entitled to counsel fees pursuant to § 17, such a limited remedy would be meaningless if we accept the plaintiff's interpretation of § 6.3. The defendant, after retaining counsel, could not force an arbitration of his challenge to his dismissal for cause and, a fortiori, could not pursue an action in court.

The construction of § 6.3 advocated by the plaintiff would mean that the plaintiff could preclude the defendant from any effective remedy by labelling a termination as one "for cause." The defendant could neither challenge the alleged causes for termination nor any claimed failure of the plaintiff to hold the required meeting within fifteen days of the receipt of notice of termination or grant the fifteen day cure period. This would be a bizarre result considering that, although the plaintiff may terminate the defendant's employment at any time without cause, a termination without cause obligates the plaintiff to pay the defendant three times his base annual salary, plus other benefits.[7] If the defendant

---

[7] Section 6.4 of the employment agreement provides: "Other Termination by the Company. Subject to Section 13, the Company may terminate the Executive's employment at any time for whatever reason it deems appropriate."

Section 13 of the employment agreement provides in pertinent part: "Severence Arrangements. . . . (c) If a Termination Event shall occur, the Company shall pay to the Executive, within thirty (30) days of the date of such Termination Event, a lump sum amount in cash (the 'Termination Payment') equal to three (3) times the Executive's base annual salary, payable to the Executive pursuant to Sections 3.1, 3.2 and 3.3 on the date of the act or action which gives rise to the Termination Payment. If a Termination Event shall occur, the Executive shall be under no obligation to seek subsequent employment and upon obtaining subsequent employment shall

is terminated for cause, he is entitled to be paid only to the date of termination. Thus, the plaintiff's interpretation would leave the defendant virtually without a remedy in the circumstances where he most needed one. "Parties to a contract may agree on the remedies available in the event of a breach of contract. If the language of the agreement discloses that the parties intended to limit the remedies to those stated, the agreement will be enforced and the party will be limited to the exclusive remedies outlined in the agreement. . . . A contract will not be construed to limit remedial rights unless there is a clear intention that the enumerated remedies are exclusive. . . ." (Citations omitted.) *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 277, 670 A.2d 880, cert. denied, 236 Conn. 915, 673 A.2d 1143 (1996). Considering the broad nature of the arbitration clause and the bizarre result required by the plaintiff's interpretation of § 6.3, we conclude that there was no such intention to limit the defendant to the remedy of an advance of attorney's fees.

The judgment is affirmed.

In this opinion the other judges concurred.

---

be under no obligation to offset any amounts earned from such subsequent employment (whether as an employee, a consultant or otherwise) against such Termination Payment. The Company shall continue to provide to the Executive and his family the life, hospitalization, surgical, major medical and dental insurance benefits . . . for a three (3) year period following the Termination Event. In addition, rights and benefits of the Executive under the other benefit plans and programs of the Company shall be determined in accordance with the provisions of such plans and programs. Neither the Executive nor the Company shall have any further rights or obligations under this Agreement, except as provided in Section 7, 8, 9, 10, and 17."