[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties are at sword's point over money owed under a contract. The question I must decide is whether their dispute will be resolved in court or before a panel of arbitrators.
 I
In 1985 the plaintiff (the Authority) and the defendant (the Company) entered into an agreement (the 1985 Agreement) to finance, construct and operate a solid waste disposal facility in Bridgeport. To finance construction the Authority issued tax-exempt bonds at the interest rates then prevailing, and the debt service on these bonds, along with the other costs of constructing and operating the facility, were allocated between the parties through complex formulae set forth in the agreement.
At the time the 1985 Agreement was entered into it was understood between the parties that, should prevailing interest rates decline so that a refinancing of the original bonds was advisable, refunding bonds would be issued, the 1985 bonds would be retired, and the parties would share in the savings generated by the refinancing. See section 11G of Schedule G to the 1985 Agreement, as amended by section 20 of Amendment No. 1, adopted on May 1, 1988. That time came in 1999, the parties agreed; the refunding bonds were issued, and the 1985 bonds were retired with the proceeds of the refunding bonds.
To accomplish this refinancing the parties entered into an agreement called "Term Sheet — 1999 Refinancing of Project Bonds" (the 1999 Term Sheet), which spelled out in detail how the saving. from the refinancing were to be shared between them. Since that time the parties have operated under the 1999 Term Sheet in sharing the refinancing savings.
A dispute has now arisen, however, over the Company's proper share of the savings. Without going into detail unnecessary at this stage of the proceedings, the Company claims that it is entitled to at least $8,000,000 CT Page 14882 in additional payments from the Authority because certain errors were made by the replacement bond underwriter chosen by the Authority in computing the parties' respective dollar shares of the savings, and those errors were memorialized in the 1999 Term Sheet.
The only issue before me now is who will resolve this dispute, the court or a panel of arbitrators, because in the 1985 Agreement the parties provided that "any and all disputes, differences, controversies or claims pertaining to or arising out of or relating to this Agreement, or the breach hereof . . . shall be finally settled by arbitration . . . by a three-person arbitration panel". See section 9.05 of the 1985 Agreement.
The Authority, which has brought this action to obtain a declaratory judgment that it is not obligated to make any additional payments to the Company, claims that the dispute is not subject to arbitration because (1) the parties never agreed to arbitrate disputes arising out of the 1999 Term Sheet, which contains no arbitration provision, as opposed to the 1985 Agreement, in which the arbitration clause quoted above appears, and (2), even if the arbitration clause in the 1985 Agreement is applicable to disputes arising out of the 1999 Term Sheet, by its very terms the arbitration clause excludes from arbitration certain types of claims which the Company is attempting to submit to arbitration.[1]
 II
Thus, there are two questions for me to address. First, did the Authority bind itself to arbitrate any disputes arising out of the 1999 Term Sheet? Second, if it did, is the particular dispute which the Company wishes to arbitrate within the scope of the arbitration clause of the 1985 Agreement?
 III
Whether the parties have an agreement to arbitrate any disputes arising out of the 1999 term sheet is for the court to decide. "Arbitration is a creature of contract and without a contractual agreement to arbitrate there can be no arbitration. " Wesleyan University v. Rissil ConstructionAssociates, Inc., 1 Conn. App. 351, 354 (1984), cert. denied, 193 Conn. 802
(1984).
To determine this question a court must look to the terms of the agreements entered into by the parties to determine their intent, and it must do so with the overlay of the "positive assurance" test adopted in both state and federal[2] arbitration caselaw. "Our Supreme Court has held that in deciding whether parties to a contract have agreed to CT Page 14883 arbitrate disputed issues, the courts must apply the `positive assurance' test first set out by the United States Supreme Court in UnitedSteelworkers of America v. Warrior Gulf Navigation Co., supra,363 U.S. 574. Board of Education v. Frey, 174 Conn. 578, 582, 392 A.2d 466
(1978). `[J]udicial inquiry . . . must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance. . . . An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage'" (Emphasis in original) Scinto v. Sosin, 51 Conn. App. 222, 231 (1998), cert. denied, 248 Conn. 963 (1999).
In order for the Authority to prevail on its first argument, that arbitration in not required for disputes under the 1999 Term Sheet, I must decide with "positive assurance" that the term sheet is a separate, free-standing contract between the parties, with no organic relationship to the 1985 Agreement. The Authority has failed to persuade me on this point.
That these two agreements are part of the same contract is shown most forcefully when Schedule G to the 1985 Agreement is compared with the 1999 Term Sheet. An explained above, section 11G of Schedule G demonstrates that a refinancing of the initial construction bonds was contemplated by the parties when the 1985 Agreement was entered into. That section, moreover, goes beyond contemplation of refinancing and spells out how the debt service savings from such a refinancing are to be allocated between the parties. Albeit in far greater detail and using a different formula, the 1999 Term Sheet does the same thing. See section 4 thereof. So, the 1999 Term Sheet is nothing more than a specification of the way the refinancing savings addressed in the 1985 Agreement are to be shared.
Moreover, section 6 of the 1999 Term Sheet makes explicit reference to the 1985 Agreement by tying together the refinancing and the negotiation of a "mutually acceptable amendment" of the 1985 Agreement "(i)n connection with the Refinancing" and "consistent with this Term Sheet". Such an amendment (Amendment No. 2) was negotiated and entered into contemporaneously with the 1999 Term Sheet. That amendment added to the definitions contained in the 1985 Agreement one of "refinancing savings". "Refinancing savings" was defined by specific reference to "Schedule P" to Amendment No. 2, which was virtually identical to the "Schedule P" attached to and referred to in the 1999 Term Sheet as the "Net Authority Savings".[3] When these three documents are read together, the conclusion is inescapable to me that they are an integrated whole, setting forth the business relationship of the parties and CT Page 14884 specifying how one aspect thereof, the sharing of refinancing savings, was to be effected.
The Authority leans heavily on the decision in TH Corporation v.Starter Corporation, Superior Court, judicial district of New Haven, Docket No. 416094, 1999 Ct. Sup. 539 (Jan. 11, 1999, Pittman, J.), but that case will not carry the weight of the Authority's argument. In TH
the court held that the arbitration clause in an agreement defining the business relationship between the parties (the agency contract) did not compel arbitration of disputes arising out of a separate "chargeback agreement". The "chargeback agreement" had been entered into after the agency contract and arose out of an unexpected dispute between Starter and U.S. customs officials over the duty payable by Starter on goods imported under the agency contract with TH; it provided for a guaranty by TH of Starter's losses from the increased duty it would have to pay on those goods, up to $4,000,000.
In holding that disputes under the "chargeback agreement", which did not have an arbitration provision, did not have to be arbitrated under the agency contract, which did, the court found that the former was "sufficiently independent of and collateral to" the latter that it was a "fully integrated [contract] that [is] not an adjunct to the agency contract". 1999 Ct. Sup. 544, 545.
The court reached this conclusion for two reasons, neither of which is present here. First, "the chargeback agreements make no specific reference to the agency contract". Id., 544. As pointed out above, that is not the case here, where the 1999 Term Sheet makes specific reference to the 1985 Agreement and the integration of their provisions by way of a contemporaneous amendment of the 1985 Agreement. Second, the TH court found that the wording of the two agreements in that case "evidences the intention of the parties to keep a distance and a distinction between the" parties' obligations under them. Id., 545. In this case, to the contrary, the 1999 Term Sheet builds on and refines the 1985 Agreement insofar as the latter contemplated and specified the sharing of refinancing savings. The 1999 Term Sheet is not collateral to the 1985 Agreement; rather, it is a supplement to it, spelling out in greater detail just how the refinancing savings contemplated in it were to be shared.
The Authority also contends that Amendment No. 2's failure explicitly to supercede the 1999 Term Sheet, as it did certain side agreements the Authority had made, shows that the parties intended that the 1999 Term Sheet was to operate as a separate agreement, outside of the 1985 Agreement and its amendments. Amendment No. 2's failure explicitly to supercede the 1999 Term Sheet is more easily understood as a recognition CT Page 14885 that the term sheet was not a "side agreement" like those it was superceding and consolidating but a fully integrated part of the 1985 Agreement already. After all, Amendment No. 2 was just that, an amendment to the 1985 Agreement, not a substitute for it.
"Arbitration is a creature of contract. . . . When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." (Internal citations and quotation marks omitted.) Industrial Risk Insurers v.Hartford Steam Boiler Inspection Insurance Co., 258 Conn. 101, 118
(2001). Applying these principles to the interpretation of the agreements signed by the parties, I conclude that the 1999 Term Sheet is part of the 1985 Agreement, and that disputes arising out of it are "disputes . . . pertaining to or arising out of or relating to" the 1985 Agreement and are, therefore, arbitrable.
 IV
Whether this particular dispute, as opposed to disputes generally, is arbitrable implicates the Authority's second claim; namely, that, even if the arbitration clause of the 1985 Agreement applies to disputes under the 1999 Term Sheet, the particular claims which the Company proposes to submit to arbitration are outside the scope of the arbitration clause. I conclude that the determination of that question is for the arbitrators.
 Whether a particular dispute is arbitrable is typically a question for the court. . . . It is well established [however] that arbitration is a matter of contract and that parties may agree to have questions concerning the arbitrability of their disputes decided by a separate arbitrator. . . . In apportioning, between the court and the arbitrators, the responsibility for determining which disputes are arbitrable, the language of the contract controls and determines whether the arbitrability of a dispute is for the court or the arbitrators. . . . The intention to have arbitrability determined by an arbitrator can be manifested by an express provision or through the use of broad terms to describe the scope of arbitration, such as all questions in dispute and all claims arising out of the contract or any dispute that cannot be adjudicated." (Internal quotation marks and citations omitted.)
International Marine Holdings, Inc. v. Stauff, 44 Conn. App. 664, CT Page 14886 668 (1997).[4]
Here the language of the arbitration clause is exceedingly broad, covering "any and all disputes, differences, controversies or claims pertaining to or arising out of or relating to this Agreement". (Emphasis added.) See section 9.05 of the 1985 Agreement. Although there is language excluding certain kinds of disputes from arbitration[5], "the exclusionary language does not explicitly exclude arbitrability from the scope of the arbitrators' authority". Id., 669.
The Authority correctly points out that it never expressly undertook to submit the question of what particular disputes are arbitrable to arbitration, but it was not required to do so. "The intention to have arbitrability determined by an arbitrator can be manifested by an express provision or through the use of broad terms to describe the scope of arbitration. . . ." Welch Group, Inc. v. Creative Drywall, Inc.,215 Conn. 464, 467 (1990). And, there is nothing ambiguous about a clause that identifies the disputes to be arbitrated as "any and all" disputes arising under the contract. "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity.Barnard v. Barnard, 214 Conn. 99, 109 (1990).
 V
The motion of the Company to compel arbitration is granted, and the arbitrators will determine whether or not the particular disputes identified in the Company's demand for arbitration, which are actually pursued by the Company[6], fall within the exclusions provided for in the 1985 Agreement.
By the Court
Joseph M. Shortall, J.