Stuart L. BELL, Plaintiff–Appellant,

v.

CENDANT CORPORATION,
Defendant–Appellee,

American Arbitration Association,
Defendant.

Docket No. 01–7622.

United States Court of Appeals,
Second Circuit.

Argued: March 8, 2002.

Decided: June 11, 2002.

Fredrick E. Sherman, Jones, Day, Reavis & Pogue, New York, NY (Charles M. Carberry, Mark R. Seiden, Traci L. Jones, on the brief), for Plaintiff–Appellant.

Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (Joseph N. Sacca, William F. Clarke, Jr., on the brief), for Defendant–Appellee.

Before CARDAMONE, F.I. PARKER, and B.D. PARKER, Jr., Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Plaintiff-appellant Stuart L. Bell appeals from the May 1, 2001 judgment of the United States District Court for the Southern District of New York (Whitman Knapp, *Senior Judge*) denying his motion for a preliminary injunction to enjoin arbitration proceedings and granting the cross-motion of his former employer, defendant-appellee Cendant Corporation, to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4. Cendant demanded arbitration before the American Arbitration Association ("AAA") of claims arising out of Bell's conduct as an employee of and adviser to Cendant. The District Court determined that, under Connecticut law, a broadly worded arbitration clause in Bell's consulting agreement with Cendant required that the issue of whether, and to what extent, the dispute was arbitrable must be decided by the arbitrator, not by the court. We affirm.

## BACKGROUND

Bell was an employee of Cendant's predecessor, CUC International, from 1979 to January 31, 1995, serving as executive vice president, chief financial officer, and treasurer. From early 1987 until his departure, while Bell was chief financial officer, the terms and conditions of his employment with CUC were governed by an employment contract, last amended in November 1991 (the "Employment Agreement"). The Employment Agreement, governed by Connecticut law, contained an indemnification clause providing that Cendant would indemnify Bell for costs related to litigation in which he was involved as a director and officer, and reimburse him for costs incurred in litigation with the company if the action was concluded in Bell's favor.

After Bell ceased working as chief financial officer in February 1995, he continued to work for CUC part-time as a consultant, reporting to the company's chief executive and president. The consulting relationship was reflected in a Special Adviser Agreement ("Adviser Agreement"), dated December 1994 and effective through February 1, 2001, that expressly "supercede[d] any prior Employment Agreement" between Bell and Cendant. It contained non-solicitation, non-competition, and non-disparagement provisions (the "non-compete provisions"), a Connecticut choice of law provision, and a broadly worded arbitration clause. The arbitration clause pro-

vided that "[a]ny controversy arising in connection with or relating to this Agreement, any stock options granted to the Executive [Bell], the Executive's employment or any services to be provided hereunder, or *any other matter or thing,* shall be determined and settled by arbitration, in accordance with the rules of the American Arbitration Association . . . ." (emphasis added). The clause contained an exception allowing Cendant to sue in court for injunctive relief arising out of Bell's violation of the Adviser Agreement.

In April 1998, following a merger of CUC and HFS Incorporated to form Cendant, an internal investigation uncovered accounting irregularities at CUC. Public disclosure of these irregularities led to a significant decline in the price of Cendant's stock and triggered numerous securities class actions by purchasers of CUC and Cendant securities. A parallel investigation by the Securities and Exchange Commission (the "SEC") discovered the existence of a fraudulent accounting scheme at CUC beginning in 1985 and running through April 1998. The SEC found that the scheme was devised to inflate CUC's operating income and "was driven by [CUC] senior management's determination that CUC would always meet the earnings expectations of Wall Street analysts and fueled by disregard for any obligation that the earnings reported need to be 'real.'" *In re Cendant Corp.,* Exchange Act Release No. 34–42933, 2000 WL 766595, at *2 (June 14, 2000). Cendant alleges that Bell was involved in and shared responsibility for these accounting irregularities, which spanned the period of both of his agreements with Cendant.

In May 1999, Cendant sued Bell in federal district court in Connecticut over matters unrelated to the accounting irregularities. Cendant claimed that Bell had breached the non-compete provisions of the Adviser Agreement by founding and operating *webloyalty.com,* an Internet-based marketing company that allegedly competed with Cendant. Cendant sought an order enjoining Bell from violating the non-compete provisions, an order extending the duration of the provisions, and damages.

In June 2000, Cendant filed a demand for arbitration with the AAA, seeking damages from Bell arising out of his alleged participation in the accounting scheme. In addition to asserting claims for fraud and breach of fiduciary duty, Cendant alleged that Bell had breached both the Employment Agreement and the Adviser Agreement.

In July 2000, Bell sued in diversity in the Southern District of New York to enjoin the arbitration on the grounds that (1) Cendant's claims arising under the Employment Agreement were not arbitrable, and (2) Cendant waived its right to arbitrate by prosecuting the Connecticut action. Bell moved for a preliminary injunction on these grounds, and Cendant cross-moved to compel arbitration. The District Court denied Bell's motion and granted Cendant's cross-motion. *Bell v. Cendant Corp.,* No. 00 Civ. 5554, 2001 WL 422881 (S.D.N.Y. Apr. 25, 2001). Construing the Adviser Agreement's arbitration clause under Connecticut law, the District Court found that the issues raised by Bell regarding arbitrability must themselves be decided by the arbitrator. *Id.* at *3. The court declined to consider whether Cendant waived its right to arbitrate, also leaving this issue for the arbitrator. *Id.* Bell now appeals.

## DISCUSSION

### I. Who Decides Arbitrability

This Court's review of whether the issue of arbitrability is for the court or for the arbitrator is *de novo. John Han-*

cock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir.2001); see also Abram Landau Real Estate v. Benova, 123 F.3d 69, 72 (2d Cir.1997) ("This Court reviews de novo a final district court order compelling arbitration."). "There is a strong federal policy favoring arbitration as an alternative means of dispute resolution." Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir.1998) (citation omitted). The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Because an agreement to arbitrate is a creature of contract, however, the ultimate question of whether the parties agreed to arbitrate is determined by state law. As the Supreme Court stated in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." See also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (purpose of the Federal Arbitration Act "was to make arbitration agreements as enforceable as other contracts, but not more so").

■ Where the scope of an arbitration agreement is ambiguous, the Federal Arbitration Act's policy favoring arbitration requires that "any doubts ... be resolved in favor of arbitration." Moses H. Cone, 460 U.S. at 24–25, 103 S.Ct. 927. But where the ambiguity relates to who determines arbitrability—that is, the arbitrability of the question of arbitrability— the Act's presumption is reversed and a court ordinarily decides the question. PaineWebber Inc. v. Bybyk, 81 F.3d 1193,

1198 (2d Cir.1996) (citing First Options, 514 U.S. at 944–45, 115 S.Ct. 1920). Parties to an arbitration agreement "may provide that the arbitrator, not the court, shall determine whether an issue is arbitrable." Id. at 1198, 115 S.Ct. 1920. But the issue of arbitrability may only be referred to the arbitrator if "there is 'clear and unmistakable' evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Id. at 1198–99 115 S.Ct. 1920 (emphasis added) (quoting First Options, 514 U.S. at 944, 115 S.Ct. 1920). Here, the parties agree that the relevant state law is the law of Connecticut.

■ Bell argues that there is a distinction between arbitration law and contract law, and that the District Court should have looked only to general principles of Connecticut contract law in conjunction with First Options in determining who should decide arbitrability. We fail to see the distinction between arbitration law and contract law. As Bell acknowledges, arbitration is a creature of contract, and a person may only be compelled to arbitrate a dispute to the extent that he has agreed to do so. See AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); White v. Kampner, 229 Conn. 465, 641 A.2d 1381, 1384 (1994). Thus, the intent of the parties, as evidenced by their contractual language, determines whether arbitrability is a determination for the court or for the arbitrator. Int'l Marine Holdings, Inc. v. Stauff, 44 Conn.App. 664, 691 A.2d 1117, 1120 (1997) (citing Emcon Corp. v. Pegnataro, 212 Conn. 587, 562 A.2d 521, 523 (1989)). The Connecticut Supreme Court's decision in City of Bridgeport v. Bridgeport Police Local 1159, 183 Conn. 102, 438 A.2d 1171 (1981), upon

which the District Court relied in finding that Bell and Cendant had agreed to arbitrate the issue of arbitrability, exemplifies the inseparability of arbitration and contract law. There, the court's conclusion that the parties intended the question of arbitrability to be determined by the arbitrator was grounded in principles of contract formation. *Id.* at 1173 (stating that "whether the parties have agreed to submit to arbitration not only the merits of the dispute but the very question of arbitrability as well depends upon the intention manifested in the agreement they have made").

Bell argues that the District Court's error was patent because none of the cases cited by the court apply the *First Options* "clear and unmistakable evidence" standard for determining the parties' intent. Bell is correct that the cases in question purport to employ Connecticut's standard for determining whether the parties agreed to arbitrate the issue of arbitrability. However, Connecticut's standard as set forth by its Supreme Court in *City of Bridgeport* parallels that of *First Options.* Under Connecticut law, "the arbitrability of a dispute is a legal question for the court unless the parties have *clearly agreed* to submit that question to arbitration." *City of Bridgeport,* 438 A.2d at 1173 (emphasis added) (quoting *Bd. of Educ. v. Frey,* 174 Conn. 578, 392 A.2d 466, 467 (1978)).[1] The fact that the Connecticut standard may not follow *First Options* verbatim is a distinction without a difference because the tests are congruent. *Cf. First Options,* 514 U.S. at 946, 115 S.Ct. 1920 (finding that "[the plaintiff] can-

not show that the [defendants] *clearly agreed* to have the arbitrator decide (*i.e.,* to arbitrate) the question of arbitrability") (emphasis added). Thus, *First Options* reinforces, rather than supersedes, the standard set forth in *City of Bridgeport.*

Bell further argues that United States Supreme Court and Second Circuit precedent requires that the District Court, not the arbitrator, decide whether his dispute with Cendant is arbitrable. He contends that the core arbitrability question here does not relate to the *scope* of his arbitration agreement with Cendant, but to the actual *existence* of an agreement to arbitrate during the period covered by the Employment Agreement. He points out that the Employment Agreement does not contain an arbitration clause and contends that, by virtue of the indemnification clause, it expressly contemplates litigation of the parties' disputes. According to Bell, because the existence of an agreement to arbitrate is a question which the parties must expressly agree to submit to the arbitrator, and because the parties failed to do so here, the District Court must decide arbitrability. We disagree.

In its arbitration demand, Cendant alleges that Bell breached both the Employment and Adviser Agreements, and it is undisputed that the latter contains a broad arbitration clause requiring arbitration of claims arising under the Agreement as well as "any other matter or thing." Therefore, the existence of a broad agreement to arbitrate is obvious. The parties' disagreement pertains to whether this language reaches all of Cendant's claims,

---

1. This rule was articulated less precisely in *Frager v. Pa. Gen. Ins. Co.,* 155 Conn. 270, 231 A.2d 531, 533 (1967), where the Connecticut Supreme Court held that "[w]hether a particular dispute is arbitrable is a question for the court, unless, *by appropriate language,* the parties have agreed to arbitrate that question, also." (emphasis added). *Frager* has

been followed in decisions of the Connecticut Supreme Court after *City of Bridgeport. See, e.g., White,* 641 A.2d at 1384 (quoting *Welch Group Inc. v. Creative Drywall, Inc.,* 215 Conn. 464, 576 A.2d 153, 155 (1990)); *Sec. Ins. Co. of Hartford v. DeLaurentis,* 202 Conn. 178, 520 A.2d 202, 204 (1987).

which is a question of scope.[2] Even if the existence of an arbitration agreement were in dispute, the Court would still be bound to analyze the parties' intent under the *First Options* standard, as *First Options* itself focused on the absence of an agreement to arbitrate. *First Options*, 514 U.S. at 941, 944–46, 115 S.Ct. 1920; *Abram Landau*, 123 F.3d at 73 (stating that *First Options* clarified "the type of evidence needed to submit to arbitration a dispute regarding whether parties ever entered into a valid arbitration agreement at all").

Addressing the *First Options* standard, Bell contends that the language in the Adviser Agreement's arbitration clause does not clearly demonstrate that the parties agreed to arbitrate the question of arbitrability. Whether the parties so agreed depends on their choice of language. Under Connecticut law, an intent to refer the matter to the arbitrator may be indicated "by an express provision or through the use of broad terms to describe the scope of arbitration, such as 'all questions in dispute and all claims arising out of' the contract or 'any dispute that cannot be adjudicated.'" *City of Bridgeport*, 438 A.2d at 1173 (quoting *Bd. of Educ.*, 392 A.2d at 467). When determining the intent of the parties, courts must look to the plain language of the contract and construe the contract as a whole. *See White*, 641 A.2d at 1385. In *City of Bridgeport*, the court considered a provision in an agreement providing for arbitration of any grievance of "any employee or group of

employees ... concerning any matter or condition arising out of the employee-employer relationship." 438 A.2d at 1173 (internal quotation marks omitted). The court concluded that this "all inclusive" language clearly demonstrated the parties' intention to submit the question of arbitrability to the arbitrator. *Id.; see also White*, 641 A.2d at 1384 (stating that broad language in an arbitration clause "generally grants jurisdiction to the arbitrator to determine the issue of arbitrability").

Here, the Adviser Agreement provided for arbitration of "[a]ny controversy arising in connection with or relating to this Agreement ... or *any other matter or thing*." (emphasis added). This clause is as broad an arbitration provision as one can imagine. The parties' grant of power to the arbitrators is "inclusive, categorical, unconditional and unlimited." *Bybyk*, 81 F.3d at 1199. The language is not confined to disputes arising from the Adviser Agreement and does not exclude any category of dispute. This interpretation of the arbitration clause is not varied by the other terms of the Agreement. Accordingly, under the standard set forth in *City of Bridgeport* and *First Options*, the arbitration clause clearly and unmistakably evidences the parties' intention to have the arbitrator determine its scope.[3]

In support of his argument that the language of the arbitration clause does not require arbitration, Bell relies on the decision of the Connecticut Court of Appeals in

---

**2.** Bell's own arguments confirm that he is challenging the scope of his agreement to arbitrate with Cendant. The principal issue he raises is whether the broad language of the arbitration clause contained in the Adviser Agreement can apply to conduct arising under the Employment Agreement, which he claims contemplates litigation of the parties' disputes. *See, e.g.*, Pl.'s Br. at 24 (stating that Bell never agreed to modify his rights under the Employment Agreement, and that "[t]he Employment and [Adviser] Agreements are

clearly distinct contracts that have no overlap except for their signatories").

**3.** Bell contends that because the Adviser and Employment Agreements are distinct contracts, the former's broad arbitration clause, without more, cannot demonstrate a clear intent to arbitrate questions of arbitrability under the latter. Pl.'s Reply Br. at 10, 12–13. But this contention is belied by the express terms of the arbitration agreement.

*Scinto v. Sosin,* 51 Conn.App. 222, 721 A.2d 552 (1998). In *Scinto,* the plaintiffs sought to enjoin the arbitration of claims arising under a construction contract. The arbitration clause covered "[a]ny controversy or [c]laim arising out of or related to the [c]ontract...." *Id.* at 555. In determining whether the trial court properly decided that the plaintiffs were not obligated to arbitrate, the court began with the standard articulated by the Connecticut Supreme Court in *Welch,* stating that "[w]hether the parties intended to arbitrate the issue of arbitrability may be determined from an express provision to that effect or from the use of broad terms." *Id.* at 556 (citing *Welch,* 576 A.2d at 155). However, relying on *Weitz Co. v. Shoreline Care Ltd. P'ship,* 39 Conn.App. 641, 666 A.2d 835, 837 (1995), the *Scinto* court found that the "broad arbitration clause d[id] not, by itself, deny the trial court jurisdiction to decide the matter of arbitrability, because the parties did not manifest an intention to arbitrate the issue of arbitrability." *Id.* at 557. The court found that while the clause indicated the broad scope of arbitration, standing alone it was insufficient because it did not expressly "provide for arbitration of arbitrability." *Id.*

We need not attempt to harmonize these lower court cases with the Connecticut Supreme Court's controlling decision in *City of Bridgeport* and its progeny, which hold that broad language in an arbitration clause—similar to the language in Bell's Adviser Agreement—can be sufficient to send the issue of arbitrability to the arbitrator. *See West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.") (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)); *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 119 (2d Cir.2001) ("[W]e must defer to the Connecticut Su-

preme Court on issues of state law ...."). Accordingly, we conclude that the District Court properly granted Cendant's motion to compel arbitration.

## II. Who Decides Waiver

■ Finally, Bell contends that the issue of whether Cendant waived its right to arbitrate by filing the Connecticut action must be decided by the District Court. "[O]rdinarily a defense of waiver brought in opposition to a motion to compel arbitration ... is a matter to be decided by the arbitrator." *S & R Co. of Kingston v. Latona Trucking, Inc.,* 159 F.3d 80, 82–83 (2d Cir.1998) (citing *Doctor's Assocs., Inc. v. Distajo,* 66 F.3d 438 (2d Cir.1995)); *cf. World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 364–65 (2d Cir.1965) (holding that issues of waiver, like issues of fraud in the inducement of the entire contract, were properly decided by the arbitrators). However, to prevent forum shopping "the district court could properly decide the question when the party seeking arbitration had already participated in litigation *on the dispute.*" *S & R Co.,* 159 F.3d at 83 (emphasis added); *see also Distajo,* 66 F.3d at 456 & n. 12 (holding that court may decide the question of waiver where "the party had previously ... litigate[d] the same dispute") (citation and internal quotation marks omitted).

In *Distajo* we held that the lower court could reach the waiver question where the plaintiff, a franchiser, commenced summary eviction proceedings against a number of its franchisees and later sought to compel arbitration of the identical controversies. Because the district court had reached and ruled on the waiver issue and we believed the district court's ruling was in error, we remanded the waiver issue to the district court for further fact-finding and reconsideration. *Distajo,* 66 F.3d at 456–57. Here, the District Court properly

left the waiver issue for the arbitrator to decide. Although the Connecticut action and the arbitration both involve the same parties and were brought pursuant to the Adviser Agreement, they pertain to entirely different facts. In the Connecticut action, Cendant alleges that Bell violated the non-compete provisions of the Adviser Agreement by operating an Internet-based marketing company. In the arbitration, Cendant claims that Bell violated the Employer and Adviser Agreements by participating in the accounting scheme. Because Cendant never litigated the accounting fraud claims, the District Court properly referred the waiver issue to the arbitrator.

## CONCLUSION

For the foregoing reasons, we conclude that (I) under the standard set forth in *First Options* and *City of Bridgeport*, the language of the Adviser Agreement's arbitration clause clearly and unmistakably demonstrates that the parties intended for the arbitrator to determine the scope of the clause and (ii) the issue of waiver was properly left for the arbitrator. Because the District Court correctly denied Bell's preliminary injunction motion and granted Cendant's cross-motion to compel arbitration, the judgment below is affirmed.